185 N.J. Super. 359 (1982)
448 A.2d 1023
DR. HERBERT R. AXELROD, PLAINTIFF-APPELLANT,
v.
CBS PUBLICATIONS, THE CONSUMER PUBLISHING DIVISION OF CBS, INC., ET ALS., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 10, 1982.
Decided May 27, 1982.
*362 Before Judges BISCHOFF, KING and POLOW.
Douglas M. Calhoun argued the cause for appellant (Carton, Nary, Witt & Arvanitis, attorneys; Douglas M. Calhoun on the brief).
Marc S. Klein argued the cause for respondent CBS Inc. (Pitney, Hardin, Kipp & Szuch, attorneys; Clyde A. Szuch and Marc S. Klein on the brief; Anthony C. Caterino and Eric Jacobson of counsel).
Morton L. Ginsberg argued the cause for respondent Arco Publishing Co., Inc. (Morton L. Ginsberg on the brief).
The opinion of the court was delivered by POLOW, J.A.D.
Plaintiff Dr. Herbert R. Axelrod, an author, appeals from dismissal of his claim for punitive damages for fraud allegedly committed by his publishers and from dismissal of all of his asserted claims against other defendants associated with publication of his work but with whom he had no direct contractual relationship.
Defendant Fawcett Publications, Inc. (Fawcett) printed and published a "How-To" series of books designed as aids in the pursuit of a variety of avocations. The "How-To" books are characteristically graphically illustrated with expanded captions for ease of reading. Defendant CBS Publications (CBS) has assumed all rights and obligations previously enjoyed or incurred by Fawcett.
Pursuant to a contract dated July 27, 1964, Fawcett agreed to publish a "How-To" book on tropical fish to be authored by Axelrod. It provided for payment to Axelrod of an advance royalty of $2,750 for the first 125,000 softcover copies sold and for percentage royalties on additional paperback sales. Fawcett was given exclusive rights to "publish or license" the book in the English language. Paragraph 5 of the contract is the core of the present controversy. It provides:

*363 Should the publisher cause the book to be placed on sale in hardcover form, the Author will receive 50 per cent of all licensing or royalty fees when received by the Publisher. [Emphasis supplied]
Axelrod contends that at the time the contract was signed the primary interest was in paperback distribution. According to his testimony, Fawcett represented that even should it be published in hardcover, only a "few thousand [copies would be] put into a library binding" and he would then receive half of the anticipated 10% royalties. A library edition is prepared with a special hardcover to withstand repeated use of the book.
Axelrod alleges that he was never advised of a 1956 agreement between Fawcett and defendant Arco Publishing, Inc., (Arco), which permitted Arco to elect to print certain "How-To" books for sale in hardcover. A number of the "How-To" titles were eventually published in both soft and hardcover editions. The Arco-Fawcett contract required Arco to pay Fawcett an author's royalty fee plus a "usage charge" on each copy sold in hardcover. The usage charge reflected Arco's election to print its own books rather than buy "signatures"[1] from Fawcett. The usage fee compensated Fawcett for the use of its "negatives and cellophanes."[2]
In February 1965 Axelrod's tropical fish book was added to the list of "How-To" volumes to be published by Arco in hardcover. Arco paid Fawcett 14¢ in royalties and 9¢ in usage fees, for a total of 23¢ per book sold, in addition to a flat fee of $300 when the book was first printed. Thereafter, Axelrod received hardcover royalties from Fawcett in the following amounts:

 October 1965 $203.00
 October 1966 117.74
 April 1967 72.52
 October 1967 33.88

*364
 April 1968 67.83
 October 1968 67.76
 April 1969 67.83
 October 1969 30.38
 April 1979 34.58
 October 1970 20.23
 April 1971 11.76
 October 1971 22.40
 April 1972 30.94
 October 1972 33.32
 April 1973 27.02
 October 1973 42.49
 April 1974 118.72
 October 1974 35.14
 April 1975 7.63
 Ocober 1975 27.30
 April 1976 29.47
 October 1976 27.93
 April 1977 14.91
 _____________________________________
 TOTAL $1,144.78

Five or six years after the book was first published Axelrod became "annoyed at receiving very small checks" without sufficient explanation to permit him to "ascertain how many books were sold...." He alleges that upon his inquiry Fawcett assured him that only 2,000 copies of the book were being hardbound. Frank Bowers, a representative of Fawcett who had handled Axelrod's royalties, testified that the royalty statements sent out periodically contained adequate information for Axelrod to compute the number of books sold. However, he did not remember whether he advised Axelrod of the precise number of sales. As of April 30, 1977, 16,354 hardcover copies had been sold and Arco had paid Fawcett $3,761.42, representing royalties of $2,289.56 and usage fees of $1,471.86. Axelrod had received a total of $1,144.78, a sum equal to half the total payments for "royalties" received by Fawcett from Arco for sales of the hardcover tropical fish book. The usage fees *365 collected by Fawcett from Arco were neither reported to nor shared with Axelrod.
Axelrod felt he was being cheated. Although he disclaims any knowledge of the Arco-Fawcett arrangement when he originally contracted with Fawcett, a photocopy of the book cover in evidence reveals Arco's name imprinted thereon. Still, he insists that Fawcett initially represented to him that only 2,000 hardcover books would be printed and that when the contract with him was executed in 1964 Fawcett failed to reveal its 1956 arrangement with Arco. He views the "usage charge" as a sham to defraud him of his royalties. Furthermore, he claims that an inordinate number of books were damaged or given away in promotions and that more books were sold than represented by Arco. Although he concedes that based upon the limited anticipated hardcover sales he expected to realize only about $200 in resulting royalties, he nevertheless insists that he would never have entered into the contract with Fawcett had he known of its relationship with Arco.
Axelrod started suit on November 13, 1978, alleging breach of contract and fraud. There was considerable disagreement over the scope of discovery. Axelrod sought to obtain the names and addresses of other "How-To" authors in order to prove a massive conspiracy to defraud them all. His blanket request was denied but he was permitted to review all correspondence between defendants and six "How-To" authors.
Apparently, the authors of two volumes, including a husband and wife team, had filed and settled lawsuits against the publisher. Two others had expressed dissatisfaction with the amount of royalties received. There was no correspondence concerning another and the sixth was not mentioned. Although Axelrod was then permitted to contact all six authors, the result essentially verified the foregoing information.
Trial by jury commenced March 30, 1981, with plaintiff's case consuming six trial days. At the close of plaintiff's case defendants made various motions. Plaintiff's claim for compensatory *366 damages based upon fraud in the annual royalty payments was held sufficient to go to the jury. However, the claims for fraudulent inducement to enter into the contract and for punitive damages were dismissed.
Thereupon, the remaining issue, compensatory damages against Fawcett and CBS, its successor in interest, was settled with prejudice. It was stipulated that plaintiff may proceed with his appeal of the issues on which the trial judge had ruled against him.
The substantive rulings were based upon New York law, and its applicability is not challenged on appeal. We thus assume the correctness of that uncontested determination although there is inadequate factual information in the appellate record for a definitive resolution thereof by this court.
The contract between Fawcett and Axelrod was signed in July 1964; the suit was instituted in November 1978. The parties agree that the applicable statute of limitations is that explained in Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, (2 Cir.1979).
We turn now to Triangle's claims which sound in fraud. The applicable statute of limitations under New York law is six years from commission of the fraud or two years from discovery whichever is longer.[3] [at 746]
Axelrod argues that the statute of limitations issue should have been decided by the jury, not the judge, and that in any event, suit was brought within two years of his "discovery" of the fraud. We reject both contentions.
In applying the law of a foreign jurisdiction to resolve an issue in this State, we are controlled by the law of the other state for substantive determinations only. For procedure, the law of this, the forum state, still controls.
Sound sense and practical reasons dictate that a suit on a foreign cause of action should be processed and tried according to the procedural rules of the forum state. It would be an impossible task for the court of such a state to *367 conform to procedural methods and diversities of the state whose substantive law is to be applied. The determination of that law is a difficult enough burden to impose upon a foreign tribunal. [Heavner v. Uniroyal, Inc., 63 N.J. 130, 136 (1973)]
See, also, Marshall v. Geo. M. Brewster & Son, Inc., 37 N.J. 176, 180 (1962); Light v. Granatell, 171 N.J. Super. 557, 563 (App.Div. 1979).
Procedurally, applicability vel non of the statute of limitations is resolved in New Jersey by the judge rather than the jury. Heavner v. Uniroyal, Inc., supra at 135; Lopez v. Swyer, 62 N.J. 267 (1973).
We now hold that whenever a plaintiff claims a right to relief from the bar of the statute of limitations by virtue of the so-called "discovery" rule, the question as to whether such relief is properly available shall be deemed an issue for determination by the court rather than by the jury. [Lopez at 272]
Since Axelrod's claim is of fraudulent inducement, i.e., that he was deceived at the time the contract was made, the continuing nature of payments he received does not serve to toll the running of the statute of limitations. The statutory limit for institution of suit under New York law is six years from date of the fraudulent act or two years from discovery of the fraud, whichever is later. Triangle Underwriters, Inc. v. Honeywell, Inc., supra, 604 F.2d at 746.
The contract was signed in July 1964. Thus, six years from the date of the alleged fraud expired in July 1970, eight years before commencement of the suit if the fraud had been or should have been discoverable at once. If not, the trial judge found sufficient knowledge of the facts attributable to plaintiff to justify the conclusion that any fraud, if it existed, was or should have been "discovered" substantially earlier than two years prior to commencement of the action.
"Mere suspicion ...," under New York law, will not impute to an allegedly defrauded party sufficient knowledge to determine that he "discovered" the fraud. Erbe v. Lincoln Rochester Trust Co., 3 N.Y.2d 321, 165 N.Y.S.2d 107, 111, 144 N.E.2d 78 (Ct.App. 1957). However, as explained in Renz v. Beeman, 589 F.2d 735, *368 751-752 (2 Cir.1978), cert. den. 444 U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979):
When plaintiffs possess "timely knowledge" sufficient to place them "under a duty to make inquiry and ascertain for themselves all the relevant facts," courts should "not view with favor a claim of estoppel grounded in fraud." Augstein v. Levey, 3 A.D.2d 595, 598, 162 N.Y.S.2d 269, 273 (1957), affirmed, 4 N.Y.2d 791, 173 N.Y.S.2d 27, 149 N.E.2d 528 (1958). All that is needed to commence the running of the statute is "knowledge of facts sufficient `to suggest to a person of ordinary intelligence the probability that he has been defrauded.'" Sielcken-Schwartz v. American Factors, Ltd., 265 N.Y. 239, 246, 192 N.E. 307, 310 (1934) (quoting Higgins v. Crouse, 147 N.Y. 411, 416, 42 N.E. 6, 7 (1895)). This court has consistently adhered to that view when applying New York law. See, e.g., Klein v. Bower, 421 F.2d 338, 343-44 (2d Cir. 1970); Talmadge v. United States Shipping Board, 54 F.2d 240, 243 (2d Cir.1931), on remand, 66 F.2d 773 (1933), cert. denied, 291 U.S. 669, 54 S.Ct. 454, 78 L.Ed. 1059 (1934). We think that the test for timely knowledge under the doctrine of equitable estoppel is similar to that set forth with regard to fraud in CPLR § 213(8)  "could with reasonable diligence have discovered it."
Furthermore, "[w]hen facts are known from which the inference of fraud flows, there is discovery of the fraud...." Simeti v. New York City Welfare Comm'r, 212 N.Y.S.2d 785, 787 (Sup.Ct. 1961).
In Arneil v. Ramsey, 414 F. Supp. 334 (S.D.N.Y. 1976), aff'd 550 F.2d 774 (2d Cir.1977), plaintiffs alleged fraud in the purchase of certain securities. The court analyzed the statute of limitations issue as follows:
If plaintiffs discovered "the facts constituting the fraud" prior to April 11, 1972, Counts I-IV would be time-barred.
Plaintiffs allege that certain risk factors were not disclosed to them when they bought securities of Blair in April of 1969. But by the summer of 1970, plaintiffs had apparently discovered that the true financial and operational status of Blair had been concealed from them at the time of their purchase. On July 23, 1970, Mr. Stockwell, acting for himself and as an agent for Mr. Arneil, sent a letter to defendant Ramsey, then President of Blair, asserting that "[t]he extremely critical nature of Blair's problems were not known by us until this time." Furthermore in a handwritten note accompanying this letter, he threatened immediate action if anyone at Blair disposed of the stock securing their notes.
These statements are compelling evidence that at least by the summer of 1970, the plaintiffs knew enough of the basic facts constituting the alleged fraud to demand rescission of the transaction. Yet in spite of the threat to take immediate action, they did nothing for almost five years after their collateral was converted into cash and sold to pay off the demand note. I conclude that *369 the statutory period began to run at that time and did not await "[the] leisurely discovery of the full details of the alleged scheme." [at 339]
Our concept of what facts constitute "discovery" is fully analogous to that of New York. In this State, applicability of the discovery rule is explained as follows:
To avoid harsh results from the mechanical application of the statute, the courts have developed a concept known as the discovery rule. Lopez v. Swyer, 62 N.J. 267, 273-275 (1973); Prosser, The Law of Torts (4 ed. 1971), § 30 at 144-145; 51 Am.Jur.2d, Limitation of Actions, § 146 at 716. The discovery rule provides that, in an appropriate case, a cause of action will not accrue until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action. Burd v. New Jersey Telephone Company, 76 N.J. 284, 291-292 (1978). The rule is essentially a principle of equity, the purpose of which is to mitigate unjust results that otherwise might flow from strict adherence to a rule of law. Lopez, supra, 62 N.J. at 273-274. [O'Keeffe v. Snyder, 83 N.J. 478, 491 (1980)]
Here, the trial judge found knowledge sufficient to trigger running of the statute chargeable to Axelrod no later than 1973. We are entirely satisfied that the following facts in the record fully support that determination. Axelrod claims that he expected to receive approximately $200 from the hardcover sale of his book. By 1970 he had received in excess of $700, substantially more than he anticipated. As early as 1972 or 1973 he believed that "Arco was not giving a fair count of the books upon which they were making royalty payments." He was, accordingly, reasonably aware of facts which, from his view, required investigation. Axelrod's sophistication cannot be overlooked. He had managed a publishing company since 1952 and had signed numerous royalty contracts. It was thus reasonable for the trial judge to find the existence of sufficient knowledge by 1973 to trigger operation of the statute of limitations.
Appellant also attacks dismissal of his claim for punitive damages. He contends that defendants may have defrauded 50 or 60 other "How-To" authors in addition to himself. He emphasizes his suspicions by calling attention to "the doggedness" with which defendants "have persisted in attempting to block plaintiff from contacting other authors in similar situations." He concludes that punitive damages are necessary to *370 deter future, similar conduct and that the facts are sufficient to demonstrate moral culpability. We disagree.
Based upon the entirety of the testimony produced by plaintiff during the six trial days, the judge concluded:
I find no deliberate intent to hurt the plaintiff directly other than an intent to act for the defendants' own benefit and to interpret contractual obligations and provisions to their best advantage; that the intent was not to injure or damage the plaintiff, but to gain monetary measures for the defendants as opposed to any intent to directly hurt the plaintiff himself.
Here again, it is conceded that the substantive law of New York is applicable. In Walker v. Sheldon, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (Ct.App. 1961), punitive damages were allowed plaintiff where a publisher induced her, by false representations, to pay it $1,380. Id. at 489, 179 N.E.2d 497. The court held:
... [W]e are persuaded that, on the basis of analogy, reason and principle, there may be a recovery of exemplary damages in fraud and deceit actions where the fraud, aimed at the public generally, is gross and involves high moral culpability. [at 491, 179 N.E.2d 497]
Based upon the specific facts before it, the court found gross fraudulent conduct, involving high moral culpability, aimed at the public generally. The conduct for which punitive damages were allowable was aimed at "defrauding the general public into entering publishing contracts ..." of no value. Id. at 492, 179 N.E.2d 497. That conduct is a far cry from the "fraud" alleged by Axelrod. In Kantor v. Comet Press Books Corp., 187 F. Supp. 321 (S.D.N.Y. 1960), an author sought punitive damages arising from a publishing contract, alleging he was induced to enter into it by fraudulent misrepresentations of defendant publisher. The claim for punitive damages was specifically disallowed. Id. at 322-323.
Subsequent New York case law has relaxed the basis for punitive damages somewhat. More recently, to support punitive damages, fraudulent conduct must either be aimed at the public generally or be gross in nature, involving high moral culpability. Later decisions suggest that any one or more of the three elements enunciated in Walker v. Sheldon may be sufficient to *371 support a claim for punitive damages as long as the behavior in question, "affects the public or involves a gross departure from moral behavior." Rosenberg v. GWV Travel, Inc., 480 F. Supp. 95 (S.D.N.Y. 1979). Recovery has been permitted where the general public was not the target of fraud if the fraud was gross and involved high moral culpability. Banco Nacional De Costa Rica v. Bremar Holdings, 492 F. Supp. 364, 374 (S.D.N.Y. 1980). The perpetrator's conduct must be significantly more reprehensible than that seen in more common frauds.
Insofar as defendants' motions to strike rest on an argument that the alleged conduct here was not "aimed at the public generally," they fail because recent New York cases demonstrate that this component of the Walker test is no longer a necessary prerequisite to an award of punitive damages in a fraud case. See Borkowski v. Borkowski, 39 N.Y.2d 982, 983, 387 N.Y.S.2d 233, 233, 355 N.E.2d 287, 287 (1976); Chase Manhattan Bank v. Perla, 65 A.D.2d 207, 211, 411 N.Y.S.2d 66, 69 (4th Dep't 1978); Greenspan v. Commercial Insurance Co. of Newark, 57 A.D.2d 387, 389, 395 N.Y.S.2d 519, 520-21 (3d Dep't 1977). Today, then, to be entitled to an award of punitive damages, a plaintiff need only show that the fraud "[was] gross and involve[d] high moral culpability." [Savino v. E.F. Hutton & Co., Inc., 507 F. Supp. 1225, 1245 (S.D.N.Y. 1981)]
Giving plaintiff's proofs the benefit of all reasonable inferences, defendants' conduct could not rise to the level of a gross fraud involving high moral culpability. See, e.g., Kardell Footwear, Inc. v. Thurmond, 417 F. Supp. 421, 422 (S.D.N.Y. 1976). Plaintiff claims that defendants took advantage of a rather loosely worded provision in the contract by characterizing certain payments as "usage charges" rather than "royalties" and were thus able to reap additional monies from the sale of the book. However, their "victim," in plaintiff's case, is a knowledgeable author and publisher. There simply is no basis for the conclusion that defendants concocted a conscious overall scheme to defraud involving high moral culpability.
Plaintiff's demand for discovery of the names and addresses of all "How-To" authors is a procedural issue. Hence, New Jersey law controls. Discovery is governed by R. 4:10-2, which provides:
Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

*372 (a) In General, Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence; nor is it ground for objection that the examining party has knowledge of the matters as to which discovery is sought.
Broad discretion is given to the trial court to determine the scope of discovery. Howard Savings Inst. v. Francis, 133 N.J. Super. 54, 59 (App.Div. 1975).
Axelrod insists that "[o]n the issue of punitive damages, what better [way to show] a general scheme to defraud the public ..." than to contact the other "How-To" authors. We conclude, however, that defendants' dealings with other authors, under these circumstances, bear little relevance to plaintiff's fraud claim. He insists that he was fraudulently induced to sign the contract. Whether anyone else was defrauded is not germane. For this purpose, it is appropriate to recognize that a necessary element of fraud is plaintiff's reliance. Meese v. Miller, 79 A.D.2d 237, 436 N.Y.S.2d 496, 499 (1981); see Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619, 624 (1981). Even if plaintiff might have discovered some evidence of similar conduct with other authors, it is difficult to find proof therein of his reliance to his detriment. Furthermore, he was given the opportunity to examine the files of and to contact six other "How-To" authors. He failed to call any of them as witnesses. The effort to make contact with additional authors appears to have been little more than a fishing expedition lacking a basis in fact. We conclude that the ruling of the trial judge was not an abuse of his discretionary authority.
We find no merit in plaintiff's claim that other "How-To" authors might establish the standard of behavior of a reasonably prudent author in deciding when to investigate the fraud. If such a standard of conduct could conceivably be established it *373 could have been developed by expert testimony by authors not involved with defendants. The failure to divulge all "How-To" authors' identities in no way limited plaintiff's access to other accredited authors for such expert opinions.
There was no credible evidence to support any claim for relief against Arco or any of the defendants who stand in its shoes. Hence, upon completion of plaintiff's presentation of evidence it was appropriate to grant the motion of those defendants to dismiss the complaint as to them. R. 4:37-2(b). We find no merit in any of plaintiff's remaining contentions. There was no evidence to support his allegations of misrepresentation of the number of books sold or of the number of damaged or free copies.
For the reasons stated, the judgment on appeal is affirmed.
NOTES
[1] A "signature" is a set of pre-printed pages, the text of the book.
[2] A "cellophane" or "negative" is essentially a photograph of the printed page, used to make the printing plates necessary to print the book.
[3] N.Y.C.P.L.R. §§ 213(9) and 203(f).