NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4636-13T4

RICHARD CATENA,

    Plaintiff-Appellant,

v.

RAYTHEON COMPANY, individually
and as successor to Air
Associates, Inc. and Electronic
Communications, Inc.; HONEYWELL
INERNATIONAL, INC., individually
and as successor to Bendix
Corporation and Allied Corp.;
ORIGINIT FABRICS, INC.; ORIGINIT
FABRICS OF NEW YORK, INC.;
COMBINATES CORPORATION,

    Defendants,

and

DANIEL P. ANDERSEN; WELLS FARGO
BANK, N.A., a division of which
is Wachovia Bank, N.A., successor
to First Fidelity Bank,

    Defendants-Respondents.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **August 18, 2016** |
| **APPELLATE DIVISION** |

        Submitted December 16, 2015 – Decided August 18, 2016

        Before Judges Alvarez, Ostrer and Haas.

        On appeal from the Superior Court of New
        Jersey, Law Division, Bergen County, Docket
        No. L-1267-11.

Szaferman, Lakind, Blumstein & Blader, P.C., attorneys for appellant (Janine G. Bauer, on the briefs).

Fitzgerald and McGroarty, attorneys for respondent Daniel P. Andersen (Joseph P. McGroarty and Michael J. Malinsky, on the brief).

Fox Rothschild LLP, attorneys for respondent Wells Fargo Bank, N.A. (Robert J. Rohrberger and Matthew S. Adams, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

This appeal requires us to apply the discovery rule to claims of common law fraud and a violation of the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20. Plaintiff Richard Catena appeals from the summary judgment dismissal of his fraud claims against defendants David P. Andersen and Wells Fargo Bank, N.A. (Wells Fargo). The claims were based on the allegation that Andersen and a Wells Fargo predecessor, First Fidelity Bank (FFB), fraudulently concealed the facts that the Teterboro property Catena purchased from Andersen was contaminated with hazardous waste and that they had done a partial clean-up. The trial court held that Catena should have discovered the fraud in June 1998, when he learned the property was contaminated. As that was more than six years before he filed his respective claims, the court concluded the claims were time-barred under N.J.S.A. 2A:14-1.

We disagree with the trial court's reasoning. The limitations period began when Catena knew or through reasonable diligence should have discovered the fraud. Under the circumstances, Catena's discovery of contamination did not constitute discovery that Andersen and FFB concealed their knowledge of the contamination and their subsequent cleanup. Even with a diligent inquiry, a reasonable person would not have discovered the fraud more than six years before the claims were filed against Andersen and Wells Fargo in August 2005 and May 2008, respectively. Therefore, we reverse.

I.

We discern the following facts from the record, extending all favorable inferences to Catena as the non-movant. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

Catena's fraud claims are based on alleged misrepresentations by Andersen and FFB in connection with Catena's purchase of the property from Andersen in 1988. Andersen had owned the property, personally or through a partnership, since 1983. That year, his partnership and First National Bank, a predecessor to FFB, entered into a loan agreement secured by a mortgage on the property. In 1986, Andersen acquired sole title, but his partnership defaulted on the loan in 1987. In August 1987, FFB took possession of the

property without obtaining title, intending to sell the property and keep the proceeds to satisfy the debt.

At FFB's direction, Environmental Waste Management Associates (EWMA) conducted an environmental assessment of the property to determine if there were any environmental problems on the property. After taking soil samples, EWMA reported "high levels of tetrachloroethylene," also known as perchloroethylene (PCE), on the property. Following EWMA's recommendations, in the fall of 1987 FFB authorized roughly eighty to 100 yards of contaminated soils to be excavated and replaced by clean fill. Even after the excavation, however, EWMA could not guarantee FFB that all the contaminated soil had been removed.

FFB's attorney sent Andersen's attorney the EWMA reports in December 1987, along with a letter stating that the contamination impeded the bank's ability to sell the property and that prospective buyers had "expressed concern" about the "environmental problem" on the property. In another letter to Andersen's attorney in March 1988, FFB's attorney wrote that FFB expected Andersen to arrange for the removal of the excavated soil that was still on the property.

In June 1988, Andersen and FFB agreed that Andersen would negotiate the sale of the property and sell the property "as is," with FFB retaining the proceeds of the sale. Their written

4

agreement also stated that Andersen, at FFB's expense, would remove the excavated soil evidently still being stored on the property. Thereafter, the contaminated soil was disposed of offsite, and replaced by clean soil onsite. EWMA opined that the property would pass inspection under the Environmental Cleanup Responsibility Act (ECRA). However, neither EWMA nor FFB informed the New Jersey Department of Environmental Protection (DEP) of the cleanup.

Catena was unaware of this contamination or remediation when he purchased the property. The June 29, 1988 contract of sale stated Catena was buying the property "as is." The contract stated that Catena had inspected the premises to his satisfaction, and no representations or warranties had been made regarding the premises, other than those in the contract.

However, the day before the sale, FFB provided Catena's attorney a July 31, 1987 affidavit (1987 Affidavit) Andersen had submitted to DEP. The affidavit stated that the only occupants of the property since 1984 were a dry wall construction contractor, a bank, and a trucking concern. The affidavit stated that, "on information and belief," these occupants had not "engaged on the Subject Property in any operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling or disposal of hazardous substances

or wastes," and that, therefore, the property was not subject to the requirements of ECRA. The letter to Catena's attorney that accompanied this affidavit also included a "letter of nonapplicability" (LNA) that DEP had issued based on the 1987 Affidavit.

Following execution of the June 29, 1988 contract, but before the closing, Andersen submitted a second affidavit (1988 Affidavit) to DEP on August 12, 1988, for the purpose of obtaining another LNA. This affidavit also stated that, "on information and belief," the three previously identified occupants had not "engaged on the Subject Property in any operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling or disposal of hazardous substances or wastes . . . ." This affidavit failed to mention that PCE-contaminated soil had been found on the property in 1987. Based on the 1988 Affidavit, DEP issued a second LNA on September 1, 1988, which stated that the sale to Catena was not subject to ECRA, with the caveat that the LNA was not a finding as to the "existence or nonexistence of any hazards to the environment at this location."

On November 1, 1988, Catena closed on the sale, and acquired title from Andersen. In 1989, Catena retained environmental consultant EcolSciences, Inc. to perform an

environmental assessment. EcolSciences' March 1989 assessment stated that past uses of the property included: "production of aircraft parts," "assembly of mechanical electrical parts," a "textile knitting and dyeing operation," the "manufacture of prefabricated exterior building facades," and "a distribution center for screen-printing inks and related supplies." The assessment made no mention of contaminated soil or PCE, but recommended further investigation of the possible presence of other contaminants.

Nearly a decade later, when Catena sought to refinance the property, the prospective lender hired Property Solutions, Inc. (PSI) to conduct an environmental investigation. In multiple reports completed in the spring of 1998, PSI documented tetrachloroethylene contamination exceeding DEP cleanup standards. In April 1998, PSI notified DEP of soil contamination on the property.

Catena was made aware of PSI's findings as early as May 26, 1998, when he was provided PSI's May 26 report disclosing tetrachloroethane contamination exceeding DEP cleanup standards. In that report, which was provided to DEP, PSI sought a "No Further Action Required" letter from DEP. This report also stated the "likely cause" of the contamination was "the historical use of the property in airplane related industries."

A-4636-13T4

By letter dated June 4, 1998, DEP advised Catena that it would not issue the requested no-action letter. DEP's letter stated that Catena must apply for and execute a Memorandum of Agreement (MOA) setting forth a plan to clean up the contamination. The letter noted that a cleanup satisfying DEP standards could result in DEP issuing a "no further action" letter. On June 22, 1998, Catena and DEP executed a MOA that required him to conduct further investigation and submit a site investigation report to DEP. In the MOA, Catena acknowledged that hazardous wastes — specifically, PCE, toluene, ethylbenzene, and xylene — had been "used, generated, treated, stored, disposed or discharged" at the site.

Following Catena's submission of a site investigation report in October 1998, DEP advised him, on December 22, 1998, that the contaminated soil "must be addressed" and "remediated." In July 1999, DEP notified Catena his MOA was "administratively complete" and directed him to submit a schedule for implementing the steps set forth in the MOA. To comply with the steps required by the MOA, Catena once again retained EcolSciences to further investigate the property. By letter dated March 21, 2000, EcolSciences reported to Catena the results of recent soil sampling, writing that it had detected soil contamination requiring additional investigation and sampling. On June 27,

2000, DEP wrote to Catena that it accepted EcolSciences' proposed work plan for additional investigation and soil and groundwater sampling.

For reasons that are unclear, EcolSciences' work plan was not implemented, causing DEP to terminate the MOA due to inactivity in March 2001. Following another delay, Catena entered into a new contract with EcolSciences in December 2003. In a May 2004 letter, EcolSciences informed Catena that new soil and groundwater sampling revealed a "larger area of contamination" on the property, including ground water and stream contamination in what was a "former oil recovery area" used by prior owner(s). This letter also recommended that Catena "retain an environmental lawyer to notify the prior owner responsible for the former oil recovery area."

On August 22, 2005, Catena filed his initial complaint against Andersen and the successors of other prior owners, asserting claims of common law fraud and violations of the CFA and other environmental protection statutes. The complaint alleged that defendants committed fraud by failing to disclose the contamination on the property. Catena took Andersen's deposition in December 2007, at which time Andersen produced the 1987 EWMA reports and communications between his and FFB's attorneys. These documents demonstrated that Andersen and FFB

knew that PCE-contaminated soil was excavated, stored, removed, and then replaced with clean soil.

Catena had not seen these documents before 2007. At his deposition, Catena testified that no one informed him of any environmental issues on the property at the time of the sale. He conceded that, before buying the property, he did not ask Andersen or FFB whether there were any environmental issues, or investigate past uses of the property. Catena also asserted that he was "under the impression that [the property] was clean" when he bought it, and was "unaware that it was polluted."

In February 2008, Catena filed an amended complaint asserting a more detailed claim of common law fraud against Andersen. On May 21, 2008, he filed another amendment asserting common law fraud and CFA claims against Wells Fargo, the successor to FFB.

Defendants moved for summary judgment on the fraud and CFA claims on the ground that they were brought more than six years after they accrued, and thus were time-barred under N.J.S.A. 2A:14-1. Catena cross-moved for summary judgment. On January 16, 2009, the court granted defendants' motion and denied Catena's motion. In a brief oral decision, the judge determined that Catena's fraud claims accrued in June 1998, when he executed the MOA. The judge rejected Catena's claim that he did

not discover the fraud until 2007, noting that Catena first asserted his fraud claim in 2005.

Catena appeals from the summary judgment dismissal of his fraud claims, arguing that, under the discovery rule, the claims did not accrue until December 2007, when he took Andersen's deposition. Wells Fargo argues that the limitations period began to run no later than June 1998, when Catena signed the MOA, acknowledging the presence of contamination. Andersen contends it began no later than December 22, 1998, when DEP required remediation.

II.

A.

We review a grant of summary judgment de novo, applying the same standard as the trial court. Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010). Whether a cause of action is barred by a statute of limitations is a question of law, also reviewed de novo. Estate of Hainthaler v. Zurich Commercial Ins., 387 N.J. Super. 318, 325 (App. Div.), certif. denied, 188 N.J. 577 (2006). The application of the discovery rule is for the court, not a jury, to decide. Lopez v. Swyer, 62 N.J. 267, 274-75 (1973).

Catena was required to bring his fraud and CFA claims within six years of when they accrued. N.J.S.A. 2A:14-1;

D'Angelo v. Miller Yacht Sales, 261 N.J. Super. 683, 688 (App. Div. 1993). The sole issue before us is when these claims accrued.

To determine when Catena's fraud claims accrued, we apply the discovery rule, which delays the commencement of the limitations period in appropriate cases. Under the rule, a claim does not accrue until the plaintiff "discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." Lopez, supra, 62 N.J. at 272. The party seeking the rule's benefit bears the burden to establish it applies. Id. at 276.

Long before the discovery rule was applied to negligence claims, Fernandi v. Strully, 35 N.J. 434 (1961), courts of equity held that, in fraud cases, the limitations period does not commence until the fraud was discovered, or through reasonable diligence should have been discovered. See Partrick v. Groves, 115 N.J. Eq. 208, 211 (E. & A. 1934); Giehrach v. Rupp, 112 N.J. Eq. 296, 302-03 (E. & A. 1933); Lincoln v. Judd, 49 N.J. Eq. 387 (Ch. 1892). The application of the discovery rule to fraud claims has also received general acceptance in our modern court system. See SASCO 1997 NI, LLC v. Zudkewich, 166 N.J. 579, 590-92 (2001) (applying discovery rule to fraudulent transfer claim under version of the Uniform Fraudulent Transfers

Act then in effect); Belmont Condo. Ass'n v. Geibel, 432 N.J. Super. 52, 83 (App. Div.) (applying discovery rule to CFA claim), certif. denied, 216 N.J. 366 (2013); Simpson v. Widger, 311 N.J. Super. 379, 391 (App. Div. 1998) (applying discovery rule to fraud); Dreier Co. v. Unitronix Corp., 218 N.J. Super. 260, 274 (App. Div. 1986) (applying discovery rule to common law fraud claim); Fed. Ins. Co. v. Hausler, 108 N.J. Super. 421, 426 (App. Div. 1970) (applying discovery rule to fraudulent concealment claim). Lopez, supra, the seminal case for the statement of the rule, recognized its applicability to fraud claims. 62 N.J. at 275 n.2.

The discovery rule is "essentially a rule of equity." Id. at 273. While statutes of limitations "are designed to stimulate litigants to pursue their actions diligently," the discovery rule mitigates "the unfairness of barring claims of unknowing parties." Mancuso v. Neckles, 163 N.J. 26, 29 (2000). The discovery rule is designed "to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations." Vispisiano v. Ashland Chem. Co., 107 N.J. 416, 426 (1987).

In fraud cases, the discovery rule is justified by an additional consideration not present in negligence cases: the victim's lack of awareness of the fraud is the wrongdoer's very

object.  The rule thus prevents the defendant from benefiting from his own deceit.  As the United States Supreme Court has explained, "something different [is] needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from even knowing that he or she has been defrauded.  Otherwise, 'the law which was designed to prevent fraud' could become 'the means by which it is made successful and secure.'"  Merck & Co. v. Reynolds, 559 U.S. 633, 644, 130 S. Ct. 1784, 1793-94, 176 L. Ed. 2d 582, 594 (2010) (quoting Bailey v. Glover, 88 U.S. (21 Wall.) 342, 349, 22 L. Ed. 2d 636, 639 (1875)).  A defendant should "not be permitted to take advantage of his own wrong" where it was "his fraudulent conduct" that was "responsible for [the plaintiff's] delay in prosecuting" his claims.  Partrick, supra, 115 N.J. Eq. at 211.

In general, the date of discovery is when the plaintiff learns or reasonably should learn "the existence of that state of facts which may equate in law with a cause of action."  Burd v. N.J. Tel. Co., 76 N.J. 284, 291 (1978).  This determination is highly fact-sensitive, and will "vary from case to case, and . . . from type of case to type of case."  Vispisiano, supra, 107 N.J. at 434.

Yet the discovery rule does not toll the statute until the plaintiff has "legal certainty" of an actionable claim, Lapka v.

Porter Hayden Co., 162 N.J. 545, 555-56 (2000), or until the full extent of the damage becomes apparent, Russo Farms v. Vineland Bd. of Educ., 144 N.J. 84, 115 (1996). The claim accrues once the plaintiff "is aware of facts that would alert a reasonable person to the possibility of an actionable claim." Lapka, supra, 162 N.J. at 555-56. Mere suspicion that the plaintiff has a claim, however, is not enough. Vispisiano, supra, 107 N.J. at 434. Thus, the plaintiff's knowledge "must be evaluated in light of the requirements of the cause of action" he asserts. Enertron Indus., Inc. v. Mack, 242 N.J. Super. 83, 91 (App. Div. 1990).

Beginning with the elements of common law fraud, a plaintiff must prove that the defendant materially misrepresented a presently existing or past fact; the defendant knew or believed it was false, intending that the plaintiff would rely on the misrepresentation; and the plaintiff reasonably relied on the misrepresentation and suffered damage as a result. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997). In the real estate context, misrepresentation may consist of intentional nondisclosure of a material defect not observable by the buyer. State Dep't of Envir. Prot. v. Ventron Corp., 94 N.J. 473, 503-04 (1983); Weintraub v. Krobatsch, 64 N.J. 445, 455 (1974). Likewise, the "unlawful practice" element

of a CFA violation encompasses a knowing concealment or omission of material fact with the intent that others rely on it. N.J.S.A. 56:8-2; see also Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 576 (2011) (CFA violation consists of (1) an unlawful practice, (2) an ascertainable loss, and (3) a causal nexus between the unlawful conduct and ascertainable loss).

The date of discovery, therefore, is when the fraud was or reasonably should have been discovered. In Belmont, supra, a condominium association brought a CFA claim premised on misrepresentations by the general contractor, after the building was severely damaged from water leaks. 432 N.J. Super. at 60, 62-63. We held that the claim did not accrue until the plaintiff "had reason to believe that it had suffered an ascertainable loss," which we found was the point at which "the true nature and extent of the water infiltration problem first became evident . . . ." Id. at 83. In other words, the claim did not accrue until the plaintiff was aware of facts establishing an essential element of its claim.

Because the wrongdoer's mental state is an essential element of the claim, discovery does not occur until the plaintiff is aware of facts indicating the wrongdoer knew his statement was false, and intended the other party to rely on its falsity. See Merck, supra, 559 U.S. at 649, 130 S. Ct. at 1796,

16                                                          A-4636-13T4

176 <u>L. Ed.</u> 2d at 597 (stating that it would "frustrate the very purpose of the discovery rule" if the limitations period commenced "regardless of whether a plaintiff had discovered any facts suggesting scienter."). In determining what facts a plaintiff knew or should have known, we will not assume the plaintiff's knowledge of information available in public records. <u>Giehrach</u>, <u>supra</u>, 112 <u>N.J. Eq.</u> at 303 (declining to impute knowledge of facts that "might easily have been ascertained from the public records"). Proof of industry custom is not determinative of what inquiry a reasonable person would make to discover the fraud, but it is relevant to the discovery rule analysis. <u>SASCO 1997 NI</u>, <u>supra</u>, 166 <u>N.J.</u> at 590-91.

In applying the discovery rule, we will not require a level of circumspection that is unreasonable under the circumstances. The Supreme Court stated that "it would be inequitable for a physician who has given [assurances of progress towards recovery] to claim that a patient, in relying upon them and not suspecting their falsity or inaccuracy, failed to exercise the 'reasonable diligence and intelligence' required by the discovery rule." <u>Lynch v. Rubacky</u>, 85 <u>N.J.</u> 65, 75 (1981) (applying discovery rule to medical malpractice claim) (quoting <u>Lopez</u>, <u>supra</u>, 62 <u>N.J.</u> at 274). That is consistent with the general principle in fraud cases, that "[o]ne who engages in

17

fraud . . . may not urge that one's victim should have been more circumspect or astute." Jewish Ctr. of Sussex Cty. v. Whale, 86 N.J. 619, 626 n.1 (1981) (rejecting argument that fraud victim's reliance on misrepresentation was unreasonable). The same trust that a wrongdoer exploits to perpetrate a fraud in the first place may delay the victim's eventual discovery of the fraud.

We are persuaded by New York decisions applying their discovery rule to fraud claims. The New York Court of Appeals has held that "knowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute." Erbe v. Lincoln Rochester Tr. Co., 144 N.E.2d 78, 81 (N.Y. 1957); see also Sargiss v. Magarelli, 909 N.E.2d 573, 576 (N.Y. 2009); Axelrod v. CBS Publications, 185 N.J. Super. 359, 367 (App. Div. 1982) (citing Erbe, supra, 144 N.E.2d at 81). A plaintiff is deemed to have discovered the fraud when he has "knowledge of facts from which the alleged [fraud] might be reasonably inferred." Erbe, supra, 144 N.E.2d at 81; see also Sargiss, supra, 909 N.E.2d at 576; Koch v. Christie's Int'l PLC, 699 F.3d 141, 155 (2d Cir. 2012) (plaintiff "could reasonably have inferred the fraud" from knowledge that there was "a high probability" the wine he purchased "was in fact counterfeit").[1]

---

[1] New York law also recognizes a form of "inquiry notice," which triggers the limitations period if the plaintiff knows facts
(continued)

B.

Applying these principles, we conclude the trial court was mistaken in finding that Catena's claims accrued in June 1998, when he executed the MOA.

When Catena first became aware of the contamination and the need to remediate in 1998, he had no reason to suspect fraud, nor had he discovered facts supporting the elements of a fraud claim.[2] His discovery of contamination was not at odds with any prior representation by Andersen or FFB. No one had affirmatively represented to Catena in 1988 that the property

---

(continued)
which would lead a reasonable person to inquire into possible fraud, but fails to pursue an investigation. Koch, supra, 699 F.3d at 155-56 (internal quotation marks and citation omitted). Our Court has not adopted this adjunct to the discovery rule in New Jersey.

[2] Wells Fargo misplaces reliance on cases applying the discovery rule to strict liability environmental claims and other environmental torts. In environmental torts generally, the claim accrues when the plaintiff is aware of contamination and that it was the fault of another. See, e.g. Hatco Corp. v. W.R. Grace & Co., 801 F. Supp. 1309, 1323-24 (D.N.J. 1992) (strict liability claim accrued when plaintiff was put on notice of contamination); but see SC Holdings, Inc. v. A.A.A. Realty Co., 935 F. Supp. 1354, 1368 (D.N.J. 1996) (rejecting argument that "the point at which plaintiff should know of another party's fault [is] the first instance in which the NJDEP or EPA finds the existence of contamination"). A fraud claim, however, requires proof of a knowing and intentional misrepresentation or concealment of material fact. Catena's knowledge of the contamination (even assuming he knew it was another's fault) does not constitute knowledge "of that state of facts which may equate in law with a cause of action" for fraud. Burd, supra, 76 N.J. at 291.

was not contaminated. The 1987 Affidavit contained no such representation, since Andersen omitted the crucial fact that he had excavated and replaced contaminated soil. The discovery of contamination in 1998 did not directly contradict any representation that Andersen or FFB made, such that Catena should immediately have suspected fraud. See Antelis v. Freeman, 799 F. Supp. 2d 854, 862 (N.D. Ill. 2011) (securities fraud claim did not accrue in 2005 where there was "no indication that Plaintiff had any reason to even suspect fraud" until one of the wrongdoers declared bankruptcy in April 2010); Belmont, supra, 432 N.J. Super. at 83 (CFA claim did not accrue until the plaintiff "had reason to believe" it had suffered ascertainable loss).

Nor did the presence of contaminants reasonably suggest that Andersen or FFB had withheld information from Catena. Since the 1987 Affidavit only pertained to the activities of occupants since 1984, it was plausible that Andersen had no knowledge of the activities of pre-1984 occupants. It was also plausible, from Catena's perspective, that Andersen would be unaware of contamination caused by his own tenants, since his 1987 Affidavit stated only that, "on information and belief," none of his tenants discharged hazardous wastes on the property. Indeed, given that Catena's own environmental assessment in 1989

failed to uncover contamination, it was reasonable to presume that Andersen and FFB were unaware of it. The fact that PSI's May 1998 report stated the contamination was likely caused by "airplane related industries" also suggested that none of Andersen's tenants were the cause, since none of them fell into that category. See Mancuso, supra, 163 N.J. at 37 (stating that patient was entitled to rely on competent expert advice regarding cause of injuries).

Given Andersen's qualified representations, Catena reasonably could have assumed that Andersen and FFB were unaware of the contamination when they entered into the sale contract in June 1988. See CSAM Capital, Inc. v. Lauder, 885 N.Y.S.2d 473, 478-79 (App. Div. 2009) (significant loss in value of investments did not put investors on notice of fraud where, under the circumstances, they "reasonably could have assumed that their losses were not necessarily the product of fraud."). Because he had no reason to suspect fraud in June or December of 1998, Catena was unaware of facts suggesting a cause of action for fraud. Therefore, he lacked a basis to plead a well-grounded claim. It follows that his claims had not yet accrued. See White v. Mattera, 175 N.J. 158, 164 (2003) (stating that a claim does not accrue until "the date when the right to

institute and maintain a suit first arose.") (internal quotation marks and citation omitted).

Therefore, we must determine at what point Catena, through the exercise of reasonable diligence, should have discovered the alleged fraud. Partrick, supra, 115 N.J. Eq. at 211. If he can demonstrate that reasonable diligence would not have revealed the fraud before August 1999 in the case against Andersen, and May 2002 in the case against Wells Fargo, his claims will not be time-barred. We are satisfied that Catena has met this burden.

As a preliminary point, we will not impute knowledge of a fraud to a plaintiff who "could not have discovered the fraud through the exercise of reasonable diligence." CSAM Capital, supra, 885 N.Y.S.2d at 479. In assessing what reasonable diligence would reveal, we will not impute knowledge of facts constituting fraud if a plaintiff had no "access to the relevant information even if he had endeavored to seek it out." Antelis, supra, 799 F. Supp. 2d at 861. "[T]he time at which a plaintiff should discover the facts that constitute the violation cannot take place before the plaintiff is able to discover such facts." Ibid. (citing Merck, supra, 559 U.S. at 651, 130 S. Ct. at 1797, 176 L. Ed. 2d at 598).

Although Catena may have inferred fraud had he known about the 1987 cleanup, he had no access to information that would

have revealed that fact, since neither Andersen, FFB nor EWMA reported the cleanup to DEP. Thus, no search of public records would have led to discovery of the cleanup. Further, their concealment of the partial cleanup was so effective that none of the numerous environmental assessments commissioned by Catena discovered evidence that eighty to 100 cubic yards of contaminated soil had been removed and replaced with clean fill.

It follows that reasonable diligence would not have uncovered facts suggesting fraud until Catena filed suit and had the right to compulsory discovery. It was only through discovery that Catena obtained the EWMA reports, which revealed that Andersen and FFB knew about the contamination, performed a cleanup, and withheld that information. There is no evidence that a more diligent pre-suit investigation would have led to discovery of the EWMA reports or other evidence of the 1987 cleanup.

Catena's delay in implementing the MOA does not change the fact that reasonable diligence would not have uncovered evidence of fraud before he filed suit. The question is not whether Catena should have been more diligent in his clean-up efforts, but rather whether "greater diligence . . . would have uncovered the cause of action any sooner." Vichi v. Koninklijke Philips Elecs., N.V., 85 A.3d 725, 798 (Del. Ch. 2014) (tolling the

statute on fraud claim premised on undisclosed price-fixing cartel where plaintiff was "blamelessly ignorant" of that fact). We cannot say that it would have, since, even by the early 2000s, Catena still had no reason to suspect fraud. The mere presence of contamination was not directly at odds with any representations made to Catena before he purchased the property, and there was no indication in his consultants' reports that contaminated soil had previously been excavated and replaced, which may have led him to suspect that Andersen or FFB withheld information from him.

Lastly, we reject Wells Fargo's argument that Catena's delay in asserting the fraud claim resulted in prejudice such that the claim should be dismissed on equitable grounds. The discovery rule accounts for the fact that a victim's belated discovery of fraud directly results from the wrongdoer's deceit. To give the wrongdoer the benefit of that late discovery would convert "the law which was designed to prevent fraud" into the "means by which it is made successful and secure." Merck, supra, 559 U.S. at 644, 130 S. Ct. at 1793-94, 176 L. Ed. 2d at 594 (internal quotation marks and citation omitted). To the extent defendants must cope with the loss of documents or fading witness memories, that is the consequence of Andersen's and FFB's calculated silence, not Catena's unreasonable delay. In

any event, defendants are not "peculiarly or unusually prejudiced," Lopez, supra, 62 N.J. at 276, as Catena, who bears the burden of proof, must also cope with the loss of evidence.

In sum, Catena discovered or through reasonable diligence could have discovered the facts giving rise to the fraud claims no earlier than May 21, 2002. Therefore, his claims against Andersen and Wells Fargo, which were filed less than six years after this date, were not time-barred.

Reversed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION