**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3870-19

VERONICA DENIS,

    Plaintiff-Appellant,

v.

MORRIS VIEW HEALTHCARE
CENTER,

    Defendant-Respondent.

_____

Submitted November 4, 2021 – Decided December 16, 2021

Before Judges Hoffman and Whipple.

On appeal from the Superior court of New Jersey, Law Division, Morris County, Docket No. L-1572-18.

Jared A. Geist, attorney for appellant.

John A. Napolitano, Morris County Counsel, and Kaufman, Semerano & Leibman, LLP, attorneys for respondent (Mark J. Semeraro and R. Scott Fahrney, on the brief).

PER CURIAM

Plaintiff, Veronica Denis, appeals from the May 8, 2020, order dismissing her complaint against defendant, Morris View Healthcare Center (Morris View), a facility under the purview of the Department of Human Services (DHS), for violating the statute of limitations and failing to present a case under the New Jersey Law Against Discrimination (NJLAD). We affirm.

Plaintiff was hired at Morris View as an Institutional Attendant or nurse's aide in May 1991. After seven years, she began working as a licensed practical nurse (LPN), and five years after that, as a registered nurse (RN), until she retired, or as she alleges, was forced out. Plaintiff was a charge nurse in 2015.

The charge nurse was responsible for various administrative tasks, including assigning tasks to other nurses; overseeing internal reporting, such as incident reports and reporting incidents to the nurse supervisor; notifying relatives of changes to the patient's medications; and reporting the last twenty-four hours and patient events in their progress notes. RNs and, on occasion, LPNs could fulfill the role of charge nurse. A charge nurse earned an extra $1.75 per hour.

In March 2015, plaintiff was provided with a performance report, which imposed a five-day suspension from April 15 to 29. The performance report found plaintiff had failed to notify the families of two different patients about

2

multiple medication and condition changes. With one patient, plaintiff failed to notify the family regarding four medication changes, and similarly, failed to report same on the Integrated Progress Notes and twenty-four-hour report. With the second, plaintiff failed to mention a change in condition to the family, as well as a change in medications. Thus, Morris View found she had "neglect[ed]" her duty and must "improve [her] compliance." Three days after the March performance report, Maureen Callery-Giordano, RN, notified plaintiff she was being transferred to another unit and would no longer be a charge nurse, but a wing nurse, unless needed because charge nurses were absent.

On April 1, 2015, plaintiff filed a grievance for the five-day suspension and for the assignment change. As to the suspension grievance, Drew Lutton, the Hearing Officer for the grievances from Morris View, summarized plaintiff's performance issues, her suspension, and the hearings held on May 13, 2015, and he provided his recommendation to Jennifer Carpinteri, a DHS director, on June 4, 2015.

Lutton found "[plaintiff] was suspended for failing to properly document critical resident care activities and failed to properly notify the resident's responsible party of those activities, involving two residents." Lutton concluded plaintiff did not fulfill her obligations as "an RN and as a [c]harge [n]urse." He

3

noted plaintiff was disciplined in 2014, with a five-day suspension, for failing to properly verify orders and document information for a resident who returned from the hospital. Lutton recommended to deny the grievance and leave the discipline in place. Carpinteri signed and approved Lutton's recommendation to deny the grievance and keep the discipline.

Plaintiff's union representative, Jenelle Blackmon, wrote to DHS and the Morris County Director of Labor Relations, Allison Stapleton, appealing Lutton's decision. Blackmon contended the medication changes were to the frequency of administration, not the prescription itself, and she was only trained to inform the family of the latter. Stapleton affirmed the denial of the grievance, noting plaintiff did not follow the established procedure following a change in medication on multiple occasions and plaintiff was previously disciplined for a lack of documentation; thus, the five-day suspension was warranted. Plaintiff did not further appeal the suspension.

As to her assignment grievance filed on April 1, 2015, plaintiff contested her transfer from a charge nurse to a wing nurse position. At the assignment grievance hearing on May 13, 2015, Blackmon, on behalf of plaintiff, contended plaintiff was an RN, which was a superior qualification to the LPN who subsequently assumed the charge nurse position; plaintiff had more seniority;

4

plaintiff had already served as charge nurse; and plaintiff would suffer a loss of pay from losing the charge nurse position. Callery-Giordano, and Cathy Engler, an administrator, had participated in plaintiff's reassignment and represented Morris View at the assignment grievance hearing. Morris View contended that it reassigns staff on a regular basis; an RN does not have priority to be a charge nurse because an LPN is also qualified; seniority does not dictate who is the charge nurse; and plaintiff would still function as a back-up charge nurse.

On June 2, 2015, Lutton summarized plaintiff's assignment grievance hearing to Carpinteri. Lutton recommended this grievance be denied as well, as plaintiff's contract did not mention seniority factoring into who was the charge nurse; the loss of pay is not applicable because the charge nurse shifts are not guaranteed but plaintiff would receive that rate when she covered those shifts; and an RN or LPN could equally be considered for the charge nurse position. Thus, Carpinteri agreed with Lutton that "[m]anagement was fulfilling their prerogative to assign staff in a way that best serves the needs" and upheld the assignment change.

Again, plaintiff enlisted Blackmon and the Local 1040 AFL/CIO (the Union) to appeal Lutton and Carpinteri's decision to Stapleton via a July 8, 2015, letter. The letter contended the LPN on plaintiff's new unit would be less

A-3870-19

credentialed and experienced, make the additional $1.75 per hour, the loss of pay is disciplinary, and as an RN, she should supervise medication distribution. Stapleton responded on August 5, 2015, noting the Union argued during its negotiations in 2009-2010 that an LPN and RN should both be able to perform the role of charge nurse, and that a charge nurse is not a title, but a function. Stapleton also denied the grievance.

On November 4, 2015, the Division of Pensions and Benefits (the Division) sent plaintiff a letter acknowledging her application for retirement. The Division's letter noted her requested effective retirement date of August 1, 2016, but plaintiff had failed to provide evidence of her birth date. A year later, the Division sent a letter dated October 19, 2016, which approved plaintiff's retirement as effective on August 1, 2016.

On December 7, 2015, and before the approval letter, plaintiff received a Preliminary Notice of Disciplinary Action (PNDA), which sought to remove her from her job effective December 29, 2015. The PNDA charged her under N.J.A.C. 4A:2-2.3(a)(1), "[i]ncompetency, inefficiency or failure to perform duties," N.J.A.C. 4A:2-2.3(a)(6), "[c]onduct unbecoming a public employee," N.J.A.C. 4A:2-2.3(a)(7), "[n]eglect of duty," and N.J.A.C. 4A:2-2.3(a)(12), "[o]ther sufficient cause."

6

The PNDA alleged that on October 21, 2015, plaintiff failed to report an adverse incident involving an employee to her supervisor or to file a workers compensation report. Specifically, plaintiff failed to properly report and document an incident where a resident struck and knocked the glasses off of an employee, because plaintiff asserted she was too busy. The PDNA further alleged that on November 12, medication went missing due to her carelessness; on November 30, she left medication unattended at a bedside in the dementia unit; on the same day, plaintiff left a resident with their head drooped and not feeling well, knowing they went through a medication change, took their blood pressure with the resident's nasal cannula detached, and returned to her routine without further action, which resulted in a doctor intervening with a stat nebulizer treatment; and that she had been "the subject of [six] disciplinary action[s,] which resulted in suspensions; [three] of which were major disciplinary actions which involved inadequate patient care."

On January 26, 2016, Robert O. Yaeger, a Union representative, wrote to plaintiff to encourage her to accept a settlement agreement. Yaeger had spoken with plaintiff on January 19 and 25, 2016, and discussed the PNDA and a settlement to resolve the matter. On January 19, plaintiff made Yaeger believe she would be okay with the settlement, so they adjourned a January 21 hearing.

But on January 22, County Personnel Director, Frank Corrente advised Yaeger plaintiff was refusing the settlement and retaining her own private counsel. She confirmed this with Yaeger on January 25.

On January 25, Yaeger told plaintiff he would go with her to the Human Resources (HR) office to begin processing her retirement and sign the settlement agreement, but plaintiff resisted, stating she felt "set up" and "harassed." Thus, Yaeger and Corrente agreed to meet for a hearing at Morris View, with plaintiff, on February 4. Yaeger advised the settlement again, stated he was ready to go on February 4 and advised plaintiff on how further appealing or fighting the PNDA would not necessarily result in a "win."

The record is empty after this point, until plaintiff signed an "[e]xit [i]nterview [f]orm," on July 28, 2016, days before her effective retirement, noting the reason for separation was retirement, and outstanding benefits to be paid. Plaintiff filed her complaint against Morris View on August 13, 2018, alleging wrongful termination under NJLAD and violation of the Equal Pay Act.

On February 28, 2020, defendant moved for summary judgment, and oral argument was heard on May 8, 2020. Later that day, the court filed an order granting defendant's motion and dismissing plaintiff's complaint with prejudice, for two reasons. The first reason was plaintiff filed her complaint outside the

two-year statute of limitations under the NJLAD. The second reason was plaintiff could not sustain the elements of the NJLAD claim on the merits. This appeal followed.

Plaintiff argues the court erred because she filed her complaint within two years of receiving her last paycheck and because she stated an actionable claim on the merits. We disagree.

"Whether a cause of action is barred by a statute of limitations is a question of law . . . reviewed de novo." Catena v. Raytheon Co., 447 N.J. Super. 43, 52 (App. Div. 2016) (citing Estate of Hainthaler v. Zurich Com. Ins., 387 N.J. Super. 318, 325 (App. Div. 2006)). Here, plaintiff's untimely filing of the complaint was reason enough for the court to dismiss her complaint. Claims brought under the LAD are subject to a two-year statute of limitations. Vitale v. Schering-Plough Corp., 231 N.J. 234, 249 (2017) (citing Montells v. Haynes, 133 N.J. 282, 291-92 (1993)). This two-year statute of limitations commences on the day when the "[d]iscriminatory termination [or] other similar abrupt, singular adverse employment action[] that [is] attributable to invidious discrimination" occurs because such acts are "generally . . . immediately known injuries . . . ." Alexander v. Seton Hall Univ., 204 N.J. 219, 228 (2010).

The court found plaintiff's complaint was not timely filed:

The easiest one to me is the statute of limitations. Receiving a paycheck two weeks after you leave is pretty standard. That doesn't mean that extends the time of -- for the statute to apply. The statute begins to run on the day of the last day. Two years later she has no opportunity to file (inaudible). So for the statute of limitations reasons, I will grant the application.

Plaintiff retired on August 1, 2016 but did not file her initial complaint until August 13, 2018. Thus, we affirm the order dismissing plaintiff's complaint.

We need not discuss the merits of plaintiff's claim, but we add the following comments because the trial court discussed the merits and incorporated them into the rationale for dismissal. The court added:

And also, as to the substance, I'll grant the application. This woman was disciplined nine times. And I added it up. It was [thirty-two] days of suspension during a certain period of time. The preliminary notice of disciplinary action was filed -- was given to her several weeks after she had already put in for retirement. She filed for retirement on November 4, 2015. And as pointed out by defense counsel, she signed the Morris County exit interview where she indicated she was simply leaving because of retirement.

Under the NJLAD, to establish a prima facie case of discriminatory discharge, a plaintiff must show that (1) she belongs to a protected group; (2) she was performing her duties at a level that met her employer's legitimate expectations; (3) she was nevertheless terminated; and (4) "the employer sought

10

someone to perform the same work after [she] left." <u>Zive v. Stanley Roberts, Inc.</u>, 182 N.J. 436, 450 (2005).

In considering potential discrimination and contended constructive termination, the trial judge found:

> In order to sustain an LAD claim, you need four different aspects to it. One, plaintiff (inaudible) plaintiff was otherwise qualified in performing the essential functions of the job. The material facts in dispute, that I get. Plaintiff was terminated. There's no evidence that the plaintiff was terminated. She retired on her own. Her employment record was not good. Being suspended [thirty-two] different days, nine different occasions, suggests to me this was not an ideal employee . . . [p]laintiff must be -- must also establish that the employer knowingly permitted conditions of discrimination so intolerable that a reasonable person would have to resign. And it further says it requires not merely severe or pervasive conduct but conduct that was so intolerable that a reasonable person would be forced to resign. That's the <u>Shepherd</u> case, 174 N.J.[1] And then the standard envisions extensive outrage, coercive and unconscionable requirements. There are no material facts in dispute which would suggest the plaintiff was treated in such a manner.

Based on our review of the record we discern no error in the trial court's conclusions. Plaintiff's remaining arguments are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

---

[1] <u>Shepherd v. Hunterdon Dev. Ctr.</u>, 174 N.J. 1 (2002).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3870-19