**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1377-18

PASSAIC ARMS CONDOMINIUM
ASSOCIATION, INC.,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

FELBEE REALTY, LP, STEPHEN
FELDMAN, and FELBEE
REALTY, LLC,

      Defendants,

and

NICK TSAPATSARIS
& ASSOCIATES and NICK
TSAPATSARIS

      Defendants-Respondents,

and

FELICE FELDMAN and estate of
ROBERT FELDMAN,

      Defendants-Appellants/
      Cross-Respondents.

_____

Argued October 28, 2021 – Decided December 29, 2021

Before Judges Whipple, Geiger, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-2636-11.

Dominic V. Caruso argued the cause for appellants/cross-respondents.

Darren C. Barreiro argued the cause for respondent/cross-appellant (Greenbaum, Rowe, Smith & Davis, LLP, attorneys; Darren C. Barreiro, of counsel; Kersten Kortbawi, on the brief).

PER CURIAM

Defendants-appellants, Felice Feldman and the estate of her brother Robert Feldman (Feldman defendants), appeal a final judgment after a jury trial and a post-judgment award of attorneys' fees. Plaintiff-respondent, Passaic Arms Condominium Association (PACA), cross-appeals. We affirm.

In June 2011 and February 2013, PACA filed a complaint and an amended complaint alleging members who purchased units within the condominium complex were not made aware of water infiltration problems in the building. PACA brought claims against defendants: Felice Feldman and Robert Feldman and his estate (collectively, Robert), the former owners of the building; Felice and Stephen Feldman, Robert's son; Felbee Realty, LP, the

entity involved in the sale of the units; Felbee Realty, LLC, the property manager; Nick Tsapatsaris, the engineer who prepared the engineering survey used in connection with the conversion of the building to a condominium complex; and Tsapatsaris's engineering company, Nick Tsapatsaris & Associates (NTA). Before trial, Robert passed away and his estate was substituted in as a defendant. The case continued with a jury trial in December 2015 and a new jury trial January 2017.

I.

We glean the following facts from the record. Beginning in 1952, Felice and her family owned a four-story multi-family residential structure composed of twenty-nine apartments and one superintendent residence in Passaic and operated the structure as an apartment building. Since the early 1960's, Felice managed the building, collected rent, and coordinated building repairs and maintenance. As the landlord of the apartment complex, Felice had approximately $200,000 in operating expenses per year.

Before converting the apartment building to a condominium complex, Felice and Robert formed Felbee Realty, LP, to own and control the building and to sponsor the building's conversion. The Feldman defendants hired NTA to prepare the required engineering survey, which set forth the condition of the

3

building to potential purchasers. Felice and Robert provided NTA with the building's historical information and dates repairs were performed. Tsapatsaris visited the property in 2000 and 2001. Felbee Realty, LP, provided him with all of the information he requested, and neither Felice nor Robert directed him to add or remove anything from the engineering survey.

The engineering survey, finalized on August 27, 2001, was written to identify major defects in the building and to prepare a capital reserve fund. The survey reported that the windows were in good condition, the building was repointed in the six months prior to the survey's finalization, "a number of lintels" needed replacement, and in-progress roofing repairs were to be completed by November 2001. A partial re-roofing project was completed in 1998. NTA calculated that the entire structure would require approximately $4.8 million in replacement costs over the next thirty years and that the capital reserve fund should contain $491,100.

Felbee Realty, LP,[1] prepared a public offering statement (POS) for the conversion. Felice and Robert acted on behalf of Felbee Realty, LP, when preparing the documents and neither of their sons were involved. The POS

---

[1] Felbee Realty, LP, was dissolved after all the units were sold.

A-1377-18

included information provided by Felice and Robert's attorneys, accountant, and engineer.

In October 2001, Felice and Robert applied to the New Jersey Department of Community Affairs (DCA) to register the condominium complex. Felice executed the registration affidavit attesting that the contents of the application were true and accurate. The registration application included NTA's engineering survey.

On March 1, 2002, the DCA approved the POS. The engineering survey was included with the POS and provided to potential purchasers. Beginning around 2002, Felice and Robert hired themselves as Felbee Realty, LLC, to serve as the property manager, but without executing a formal contract.

Between 2002 and 2004, several members of PACA purchased condominium units, including Nicholas Calamusa, who rented units in the building prior to buying. The remaining buyers were new to the building. The majority of the units were sold, and the Feldman defendants kept four units for themselves.

Before the conversion, Calamusa, and other renters, were concerned about waterproofing in the structure. Water stains and wet spots, which would crumble and deteriorate if touched, around his windows indicated that water

A-1377-18

was entering the interior; there were also water stains on his ceiling. Calamusa and other renters raised their concerns about water proofing and water infiltration at a May 2, 2001, condominium conversion meeting.

Calamusa and other renters wrote to the Feldman defendants requesting more information prior to purchasing any units, including, how many lintels needed repair, the cost of repairs, and a confirmation that the reserve would cover needed repairs such as lintels, the roof, leaking windows, and bringing the building up to code. In response, the Feldman defendants' realtor, Prime Realty, distributed a flyer to the renters representing that a worn section of the roof would be replaced by January 2002 and that "all pointing, parapets, and lintels repairs and replacement" work was being carried out. Finally, the flyer stated that the repair and replacement work would keep the building "up to code."

When he purchased a unit, Calamusa relied on the POS and the engineering survey. He hired a home inspector and forwarded the inspector's report to the Feldman defendants to again raise his concerns about water infiltration and the condition of the building. In response, the Feldman defendants' attorney, Jay Pasternack, provided an August 27, 2002 letter, with attachments attesting to the quality of various elements of the building such as

6

the oil tank, the underground storage tank, the windows, and the roof. Notably, the documents stated that the entire east side of the roof had been replaced in the eight months prior to August 27, 2002.

Shortly thereafter, Calamusa received a letter NTA sent to Pasternack dated October 14, 2002, that reported that the majority of the lintels were adequate and did not need to be replaced. Moreover, the cost of replacing the lintels that needed repair would be covered by the amount of the reserve capital. Further, the letter stated that one portion of the roof needed repair, the remaining areas have a life expectancy of twenty years, and the cost of future replacement of the roof would be covered by the reserve capital.

On January 29, 2003, Calamusa received a letter from Felice to Pasternack representing the southwest corner of the roof was repaired in November 2001 and the northwest quadrant was replaced in March 2002. According to Calamusa, this letter provided him with the assurances he needed that all of the windows had been sealed to prevent water leakage because he lived in the northwest section of the building. Ultimately, Calamusa bought two units in the building. At closing, Felice and Calamusa toured his units to confirm repairs made for the water infiltration.

7

Hillary Levin purchased a unit after first touring the building with Felice in 2002. Although Levin noticed water damage, including peeling paint and flaky plaster, around the bedroom window, Felice assured her that the issue was minor and that it would be repaired prior to closing. Moreover, after reviewing documents provided to her about the condition of the building, she believed that the structure was in "good condition." Further, she read the engineering survey to mean that the entire building had been repointed in the six months prior to the finalization of the engineering survey and that the issues pertaining to damaged lintels were minor. As for the roof, she believed that one area needed repair and that the work would be completed. Based on the engineering survey, she thought another portion of the roof was replaced in 1998, but had she known that the actual date was 1989, the information would have made a difference to her.

By March 4, 2004, all the units in the building were sold. Felice and Robert made approximately $2.4 million by converting the apartment building to a condominium complex. Some complaining owners purchased units later. In August 2005, Tobias Roth purchased his unit as a resale from a third-party and not from the Feldman defendants. He did not hire a home inspector because he was satisfied with the information contained in the POS and the

engineering report. He relied on the fact that the exterior of the building had been repointed within the six months prior to the issuance of the engineering survey. Moreover, the engineering report and POS caused him to believe that he would not experience water infiltration from the roof. Roth moved into his unit in March 2006. In 2006, Stephen Anger purchased his unit as a resale and did not review the POS prior to purchase.

Shortly after purchasing their units, several owners, including Calamusa, Levin, Roth, and Anger, experienced minor water infiltration issues and notified the Feldman defendants. In response to some complaints, Felice, acting on behalf of Felbee Realty, LLC, placed the owner's name on a list and contractors performed spot repairs.

After moving in during March 2006, Roth noticed water stains near the window ledge in the dining room. When Roth alerted Felice to the problem, she claimed it was due to a problem with the fire escape. However, several months later, he experienced water infiltration from the same location. Moreover, the problem worsened because he soon noticed damage on the dining room ceiling and in the bathroom.

After moving in in 2006, Anger noticed the walls deteriorating and crumbling around the windows of his unit. Although he complained to Felice,

she never came to look at the problem or helped. It was not until his tenure on PACA's Board of Directors (the Board) between 2008 and 2011 that he realized that other tenants had similar water infiltration issues.

By 2007, Calamusa, Levin, and several other owners of the condominium units complained to Felice and Robert that they were experiencing worsening water infiltration in their units. Moreover, owners who lived in the southwest portion of the building complained of leaks and, as a result, the southwest portion of the roof was replaced in 2007. After Calamusa complained again in 2008, Felice changed the repointing company, but the water infiltration problem worsened.

In June 2009, Calamusa was elected president of the Board and Roth was elected treasurer. Felbee Realty, LLC was still the property manager. Later in 2009, Calamusa toured the building with the waterproofing contractor, Joe Gonda, and was shown a one-half inch gap between the parapet wall and the roof on the northwest quadrant and Gonda reported to Calamusa that the water infiltration problems at the building were beyond his ability to repair.

Prior to 2010, Felice did not recommend that the Board hire an engineer to investigate the water infiltration issue. By June 2010, the Board voted to change the property management company from Felbee Realty, LLC, to Dovan

A-1377-18

Management Company and Felbee Realty, LLC, was officially dismissed as the property manager. After the change in the property management company, Anthony Nardone of Dovan Management Company recommended that the Board hire an engineering firm and general counsel.

Nardone personally observed the conditions in the building and called them deplorable. He stated that he saw water penetrating numerous walls and ceilings. He observed missing sheetrock, missing mortar between bricks, missing bricks, cracked bricks, missing coping from the roof, and poor-quality repairs, among other issues. Thereafter, the Board retained Morris Engineering (Morris) to perform a transition study of the building and retained new legal counsel.

During Morris's evaluation of the units, Nardone obtained water infiltration readings reflecting excessively wet conditions. Shortly thereafter, unit owners removed plaster from their walls to discover water infiltrating their units from the exterior walls and from around the windows. By February 2011, Morris completed the transition report and submitted it to the Board.

## II.

On June 6, 2011, PACA filed a thirteen-count complaint alleging common law fraud, negligent misrepresentation, negligence, breach of

fiduciary duty, breach of contract, violations of the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20, and violations of the Planned Real Estate Development Full Disclosure Act (PREDFDA), N.J.S.A. 45:22A-21 to -56. PACA alleged that Felice, Robert, Stephen, Felbee Realty, LP, Tsapatsaris, and NTA failed to disclose the true condition of the residential condominium complex and their intention to use the capital reserve to fund various items in the complex.

On February 4, 2013, PACA filed an amended complaint to add Felbee Realty, LLC, as a defendant, and alleged breach of contract and that Felbee Realty, LLC, was negligent in providing and performing property management services. PACA also sought to add additional claims against Robert and Stephen because Felbee Realty, LP, was a dissolved partnership.

On September 26, 2013, NTA moved for summary judgment pursuant to Rule 4:46-2(a) arguing PACA's claims were barred by the statute of limitations and the statute of repose. On October 10, 2013, the Feldman defendants filed a cross-motion seeking summary judgment on the basis that the claims against them were similarly time-barred.

In November and December 2013, the court heard oral arguments on the motions and conducted a Lopez[2] hearing regarding whether PACA's action was time-barred. The court, in a January 2014 order, granted NTA's motion for summary judgment holding that PACA's claims against NTA were time-barred; but, in a March 2014 order, the court denied the Feldman defendants' motion concluding that PACA's claims against them were not time-barred.

The first jury trial began on December 1, 2015. At the conclusion of PACA's case, the Feldman defendants moved under Rule 4:37-2(b), seeking an involuntary dismissal and arguing, again, that PACA had no right to relief because the action was time-barred. The court denied the motion, because it pertained to issues addressed at the time of the Lopez hearing, and thus the Feldman defendants were required to bring a timely motion for reconsideration or to file a motion to request more specific findings of fact and conclusions of law prior to trial. During trial, the court dismissed the Feldman defendants' counterclaims and granted a motion to dismiss Stephen from the litigation.

On January 25, 2016, the jury rendered its verdict concluding that Felbee Realty, LP, violated PREDFDA, committed common law fraud, and made

---

[2] Lopez v. Sawyer, 62 N.J. 267, 272-75 (1973) (explaining that a cause of action will not accrue until an injured party discovers or should have discovered the basis for an actionable claim).

negligent misrepresentations, and finding it liable for damages on those counts. The jury further found that Felbee Realty, LP, had not violated the CFA and was not liable for the common law fraud claim raised for false representations of material fact made to the purchasers of the condominium units.

The jury found neither Felice nor Robert personally liable for Felbee Realty, LP's, actions. The jury concluded that neither Felbee Realty, LLC, nor Felice was negligent while acting as the property manager. The jury did find that Felice and Robert breached their fiduciary duties, but that they were not the proximate cause of PACA's damages. Finally, the jury concluded that the NTA defendants' negligence was the proximate cause of PACA's damages, and that the NTA defendants were liable for eighty percent of PACA's damages.

On February 11, 2016, PACA moved for a new trial pursuant to Rule 4:49-1 and Rule 4:39-2 arguing that the jury's verdict was inconsistent and was a result of juror confusion. PACA argued that the jury's findings of common law fraud and negligent misrepresentation, but not a violation of the CFA, were inconsistent because the CFA violation had fewer elements to satisfy, a lower burden of proof, and similar elements as the PREDFDA violation. The court agreed and granted PACA's motion for a new trial, finding juror

14

confusion as to the CFA and PREDFDA claims, how the jury calculated certain damages, and whether the jury understood the ultimate outcome charge.

The second jury trial began on January 11, 2017.  At the conclusion of PACA's case, the Feldman defendants again moved under Rule 4:37-2(b), asking for an involuntary dismissal of various counts and arguing PACA's action was time-barred.  The court denied the motion, in part, because there was sufficient evidence for the jury to conclude from the evidence that the claims of breach of fiduciary duty, common law fraud, and violation of the CFA were established.  However, the court granted the motion, in part, by dismissing the negligence claims against Felice and Robert as property managers and Board members, because expert testimony would have been required to assert those claims.  Moreover, the court explained that those counts also related to Felbee Realty, LLC, and that the entity itself could not be sued because there were no surviving claims against its members, Felice and Robert.

On February 10, 2017, the jury rendered its verdict as to Felbee Realty, LP, Felice, and Robert, which were the only remaining defendants.  The verdict sheet asked the jury to make its liability findings as to each defendant

as to four different areas of the building: the roof; the exterior (repointing); the lintels; and the windows.

The jury concluded that Felice and Robert were each liable for the consumer fraud violation, but only as to the roof and lintels, and the PREDFDA violation, but only as to the roof and lintels. The jury also found that Felice engaged in common law fraud about the lintels, but not the roof, exterior (repointing), and windows. The jury did not find that Robert engaged in common law fraud. The jury concluded that both Felice and Robert, acting in bad faith, breached their fiduciary duties by using reserve funds for maintenance in violation of the by-laws and without Board approval, which caused damages. As to Felbee Realty, LP, the jury concluded that it engaged in consumer fraud as to the roof, exterior, and lintels; violated PREDFDA; and engaged in common law fraud regarding the lintels.

On February 22, 2017, a punitive damages trial was conducted before the same jury, resulting in a verdict of no cause. The only parties on the verdict sheet were Felbee Realty, LP, Felice, and Robert. Regarding punitive damages on the common law fraud claim, the jury concluded that Felbee Realty, LP's, and Felice's fraudulent acts or omissions regarding the lintels were not made with actual malice or, alternatively, a wanton or willful

16

disregard to PACA's rights. Regarding punitive damages on the breach of fiduciary duty claim, the jury determined that PACA suffered harm because of Felice's and Robert's breaches of their fiduciary duties; however, it concluded that the breaches were not made with actual malice or accompanied with wanton and willful disregard to PACA's rights.

On May 19, 2017, the court denied PACA's motion for judgment notwithstanding the verdict pursuant to Rule 4:40-2. On October 23, 2018, the court: granted PACA's opposed motion for attorneys' fees, costs, and interest; issued an opinion pertaining to that motion decision; and entered a final judgment. It entered judgment against Felbee Realty, LP, in the amount of $1,578,000 plus attorneys' fees and costs in the amount of $1,034,592, plus pre-judgment interest of $79,962.79 for a total judgment of $2,692,554.47. It entered judgment against Felice and Robert, jointly and severally, in the amount of $403,000 plus attorneys' fees and costs of $1,034,592, plus pre-judgment interest of $35,425.86 for a total judgment of $1,473,017.80.

The Feldman defendants' appeal followed, arguing the claims should have been dismissed due to the statute of limitations. In a cross-appeal, PACA contends that the court erred when it denied its motion for judgment notwithstanding the verdict (JNOV) after the second trial.

A-1377-18

# III.

The Feldman defendants contend that the court erred when it failed to dismiss PACA's claims of common law fraud, common law negligent misrepresentation, and violation of the CFA due to the expiration of the statute of limitations for each claim. We disagree. We review this question under a de novo standard because determining whether a claim is time-barred is a question of law. Catena v. Raytheon Co., 447 N.J. Super. 43, 52 (App. Div. 2016).

PACA filed its complaint on June 11, 2011. At the Lopez hearing in 2014, the court considered whether PACA knew that the Feldman defendants made material misrepresentations or omissions in the POS for at least six years prior to the filing of PACA's fraud claims. During the hearing, PACA presented testimony from six of the unit owners, describing how the Feldman defendants addressed or ignored initial and ongoing complaints about the conditions. The court ultimately held that PACA proved problems with the structure of which it was not made aware until after the statutory time frame; thus, the cause of action could proceed. The court rendered a brief oral decision after the Lopez hearing but did not issue a full written decision.

Based on our review of the findings, we discern no error in the court's conclusion that PACA's action could proceed against Felice and Robert.

A statute of limitations clock begins running when an action accrues, Palisades Fort Lee Condo. Ass'n v. 100 Old Palisades, LLC, 230 N.J. 427, 442 (2017), and action accrues on the date of "discovery" when "the facts presented would alert a reasonable person, exercising ordinary diligence that he or she was injured due to the fault of another," Caravaggio v. D'Agostini, 166 N.J. 237, 246 (2001). Thus, the date of "discovery" is when a plaintiff learns or should learn about the existence of facts that create a cause of action, Burd v. N.J. Tel. Co., 76 N.J. 284, 291 (1978), so the "[t]he standard is basically . . . objective," Caravaggio, 166 N.J. at 246.

There is a six-year statute of limitations for common law fraud, negligent misrepresentation related to property, and a violation of the CFA. N.J.S.A. 2A:14-1; see Catena, 447 N.J. Super. at 52. Under the discovery rule in cases involving fraud or deceit, the statute of limitations does not commence "until the fraud was discovered, or through reasonable diligence should have been discovered." Catena, 447 N.J. Super. at 53-54. This prevents a wrongdoer from benefiting from his or her victim's lack of awareness of the fraud. Id. at 52. In essence, the discovery rule is a rule of equity, id. at 53,

that courts apply to avoid a "mechanical application of a statute of limitations" with the discovery rule. Vispisiano v. Ashland Chem. Co., 107 N.J. 416, 426 (1987),

Here, the record provided ample support for the court to conclude that PACA's fraud claims did not accrue until 2011 when Morris's transition report was issued, which showed PACA suffered an ascertainable loss. Specifically, the court heard testimony from unit owners and Board members that demonstrated that PACA was not aware of the ascertainable loss until the transition report revealed the nature, extent, and scope of the water infiltration problem.

During her time on the Board, serving as its president from 2003 to June 2009, Felice did not disclose that unit owners had been complaining about water infiltration. Calamusa said Felice did not disclose the June 2005 waterproofing repairs to the Board until September 2005. Felice did not make any further disclosures in the November 2005 meeting among unit owners. From Calamusa's initial perspective, the repairs only seemed to be maintenance-related and were not evidence of a systemic problem. As to repairs, Felice was the contact person who interfaced with contractors and

other vendors. Felice did not provide estimates or invoices to the Board for repair work conducted on the building.

Critically, it was not until Felice left the Board entirely in 2010 that the Board was informed that an engineer was needed to evaluate the building. In fact, Morris's 2011 transition report was the Board's first notification that the building suffered from significant water infiltration and that the information presented in the POS and the accompanying engineering survey was inaccurate.

The court accepted as credible the unit owners' testimony that they did not know about other owners' water infiltration problems and that Felice and Robert downplayed the problems by providing assurances that any water infiltration issues had been remedied. The court found that Felice, who controlled the checkbook and financial records as PACA's president, admitted that she had not provided written documentation of waterproofing repairs or financial records. The court, after the <u>Lopez</u> hearing, held that PACA proved problems with the structure of which it was not made aware until after the statutory time frame, so the cause of action could proceed.

The court's finding was proper because this evidence sufficiently showed that the Feldman defendants prevented PACA from discovering the severe and

21

pervasive nature of the water infiltration. See Catena, 447 N.J. Super. at 54 (stating that defendant should not benefit from using his or her fraudulent conduct to delay plaintiff in timely prosecuting claims). As a result, the record supported the court's conclusion that the statute of limitations clock did not begin to run, at the earliest, until 2011 when PACA was first made aware that it suffered an ascertainable loss.

IV.

The Feldman defendants contend that the court erred in declining to dismiss PACA's PREDFDA claims because a statute of repose applied. We disagree because PREDFDA was equitably tolled. Thus, the PREDFDA claims were not time-barred.

During the Lopez hearing, the court considered whether the Feldman defendants prevented PACA from discovering the basis for its claims or induced PACA to let the PREDFDA time limitation expire. We review this question under a de novo standard because determining whether a claim is time-barred is a question of law. Catena, 447 N.J. Super. at 52.

The relevant section of the PREDFDA, N.J.S.A. 45:22A-37, pertains to untruths, omissions or misleading statements by a developer; liability; persons liable; and the invalidity of an agreement by a purchaser. N.J.S.A. 45:22A-

37(d) provides that "[a] person may not recover under this section in actions commenced more than [six] years after his first payment of money to the developer in the contested transaction."  The statute itself does not define this timeframe as either a statute of limitations or a statute of repose.

We do not rule on whether N.J.S.A. 45:22A-37(d) is a statute of repose or a statute of limitations because it is unnecessary to do so here.  We note courts have analyzed the time limitations contained within the PREDFDA as a statute of limitations.  See, e.g., Nobrega v. Edison Glen Assocs., 167 N.J. 520, 549 (2001); Flinn v. Amboy Nat'l Bank, 436 N.J. Super. 274, 284 (App. Div. 2014); Enfield v. FWL, Inc., 256 N.J. Super. 502, 523 (Ch. Div. 1991), aff'd, 256 N.J. Super. 466 (App. Div. 1992).  We do, however, provide the relevant analysis for our finding that PREDFDA was equitably tolled.

The R.A.C. Court explained that a statute of repose is often "equated" with a statute of limitations, but they are distinct concepts.  R.A.C. v. P.J.S., Jr., 192 N.J. 81, 100 (2007).  A statute of limitations sets forth an end date at which the pursuit of a claim is foreclosed, whereas a statute of repose provides a "fixed beginning and end to the time period a party has to file a complaint." Id. at 96.  After the expiration of the statutory time period in a statute of repose, a cause of action "literally ceases to exist." Ibid. (quoting Cyktor v.

23

<u>Aspen Manor Condo. Ass'n</u>, 359 N.J. Super. 459, 473 (App. Div. 2003)). A period of repose is not related to when the injury occurs or when the cause of action accrues. <u>Ibid.</u> Instead, when the repose period ends, a defendant is granted immunity from suit. <u>Id.</u> at 96-97. In general, courts do not expand the period of repose unless the Legislature intended a tolling period for extraordinary circumstances. <u>Id.</u> at 97, 101. The Court in <u>Nobrega</u>, observed that PREDFDA does not include a tolling provision. 167 N.J. at 549.

But, the tolling of a statute of repose or a statute of limitations is permissible on equitable grounds when the strict application of the statute would conflict with the legislative purpose of the statute and would inflict harm on the plaintiffs. <u>Price v. N.J. Mfrs. Ins. Co.</u>, 182 N.J. 519, 525 (2005).

Subsequent to our Supreme Court's decision in <u>R.A.C.</u>, the Supreme Court of the United States considered whether Section 13 of the Securities Act permitted an individual to file a complaint more than three years – with tolling – after the securities offering, in <u>Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.</u>, ___ U.S. ___, 137 S. Ct. 2042, 2048 (2017). The comparison is illuminative.

The Securities Act of 1933 § 13, 15 U.S.C. § 77m, in pertinent part, provides that "[i]n no event shall any such action be brought to enforce a liability created under section 77k [11] or section 77l(a)(1) [12(a)(1)] more

24

than three years after the security was bona fide offered to the public, or under section 77l(a)(2) [12(a)(2)] more than three years after the sale." The Court considered how the provision "in no event" does not provide exceptions to the time bar, Cal. Pub. Emps.' Ret. Sys., 137 S. Ct. at 2049, and how legislative history showed that Congress amended the Securities Act to shorten the time during which defendants could be held liable after defendants' last culpable act, id. at 2050. Thus, the Court concluded the provision was a statute of repose and that the three-year time bar reflected the legislative objective to give a defendant a complete defense to any suit after a certain period. Id. at 2049.

On tolling, the Court stated that "[t]olling is permissible only where there is a particular indication that the legislature did not intend the statute to provide complete repose but instead anticipated the extension of the statutory period under certain circumstances." Id. at 2050. Where a provision does not provide an express exception but another provision provides general tolling, courts must "analyze the nature and relation of the legislative purpose of each provision" to determine whether tolling applies to a particular provision. See id.

Returning to PREDFDA, N.J.S.A. 45:22A-37(d), in pertinent part, provides: "A person may not recover under this section in actions commenced more than [six] years after his first payment of money to the developer in the contested transaction." PREDFDA, unlike § 13, does not contain an express constraint like "in no event."[3] Thus, we look to the statute's legislative history to determine whether the legislature "anticipated the extension of the statutory period under certain circumstances" through tolling. Cal. Pub. Emps.' Ret. Sys., ___ U.S. ___, 137 S. Ct. at 2050.

We have said the legislative intent of the PREDFDA is to ensure "honesty, public understanding and trust in the sale of complex interests." Tung v. Briant Park Homes, Inc., 287 N.J. Super. 232, 237 (App. Div. 1996); see also Cybul v. Atrium Palace Syndicate, 272 N.J. Super. 330, 335 (App. Div. 1994) (stating that intent of PREDFDA was to provide consumers with remedies and not curtail opportunities to redress fraud). Additionally, PREDFDA is consumer-oriented and remedial in nature. Tung, 287 N.J.

---

[3] PREDFDA also does not share the same language as other New Jersey statutes that we have said are clearly statutes of repose, such as N.J.S.A. 25:2-31, for extinguishment of a claim for relief under the Uniform Voidable Transactions Act, and N.J.S.A. 2A:14.1-1, for protecting designers and builders.

Super. at 238. Thus, PREDFDA should be read expansively and liberally in favor of protecting consumers, rather than read narrowly. Ibid.

Further, equitable tolling is permitted when a plaintiff was induced or tricked into missing a filing deadline. Price, 182 N.J. at 525-27. We have cautioned against allowing a defendant to use a statute of limitations or repose "as a sword rather than a shield" to prevent a plaintiff from filing despite the defendant's poor conduct. Dunn v. Borough of Mountainside, 301 N.J. Super. 262, 280 (App. Div. 1997).

We agree with the trial court's finding that there was substantial evidence in the record for the court to conclude that the Feldman defendants used their positions as Board members to induce the unit owners into believing that there were no serious issues with significant water infiltration. Moreover, the record supports the court's conclusion that the Feldman defendants prevented PACA from obtaining information that would lead it to conclude that it needed to file the PREDFDA claim within the limitation period. Specifically, Felice and Robert controlled the information pertaining to repairs, water infiltration, and the budget, which prevented the unit owners from realizing the scope of the water infiltration problem. For those reasons, we

27

discern no error in the trial court's conclusion PACA was not time-barred from bringing its PREDFDA claim.

V.

The Feldman defendants argue as plain error that the court erred in granting PACA's motion for a new trial on all issues at the conclusion of the first trial. They contend that the court erred in failing to identify the discrete issues affected by the tainted verdict, that there was only support for the grant of a partial new trial, and that the court should have upheld the portion of the verdict that exonerated them from personal liability. We reject these arguments.

During deliberations in the first trial, the court received questions from the jury that were unrelated to the law as instructed. One question pertained to the weight of the claims against the Feldman defendants. Another question pertained to compounding damages under "each of the law[s]" such as the CFA, PREDFDA, and common law fraud. The court explained to the jury that it does not compound the damages and re-read its instructions, which included an ultimate outcome charge that informed the jury that certain damage awards may be doubled or tripled depending on the applicable statute.

Ultimately, the jury concluded that PACA proved by clear and convincing evidence that Felbee Realty, LP, but not Felice nor Robert, engaged in common law fraud by intentionally and knowingly failing to disclose material facts it was obligated to disclose to purchasers. It awarded $70,000 in damages to PACA. The jury also found that PACA proved by a preponderance of the evidence that Felbee Realty, LP, violated the PREDFDA by making an untrue statement of material fact, an omission of a material fact, or a misleading statement of material fact in the POS or application to convert the building to a condominium. It awarded $116,000 in damages to PACA. Further, the jury found that PACA had proven by a preponderance of the evidence that Felbee Realty, LP, negligently made a false misrepresentation of material fact to unit purchasers. It awarded $70,000 in damages to PACA. However, the jury concluded that PACA had not proven by a preponderance of the evidence that Felbee Realty, LP, violated the CFA by intentionally omitting, knowingly concealing, or suppressing any material fact in connection with the sale of the units. After the verdict was returned, the court questioned the jury and concluded that the jury did not understand the interplay of the damage awards.

A-1377-18

The court heard argument on PACA's motion for a new trial on April 22, 2016, and determined that a verdict was likely the product of jury mistake or confusion and could not stand, specifically, the jury's conclusion that Felbee Realty, LP, committed common law fraud because the unit owners relied on false statements and awarded $70,000, yet that neither Felice nor Robert committed common law fraud. Moreover, the jury determined that there was no CFA violation by Felbee Realty, LP, despite the standard to prove fraud is by clear and convincing evidence whereas the standard under the CFA is by a preponderance of the evidence, which is lower.

As to PREDFDA, the jury found Felbee Realty, LP, made an untrue statement of material fact, omitted a material fact, or made a misleading statement of material fact in a POS or application to register a condominium conversion. The jury determined that the safe harbor provision[4] did not apply, but still concluded that neither Felice nor Robert had personal liability under PREDFDA. Moreover, the verdict sheet's description of personal liability under the PREDFDA was inconsistent with the language of the statute.

---

[4] PREDFDA contains a "safe harbor" provision, N.J.S.A. 45:22A-37(a), which prevents liability if a principal did not know and in the exercise of reasonable care could not have known about any untruth, omission, or misleading statement.

There was confusion over the award of $70,000 and what the jury intended with respect to that award. The jury foreman stated that the $70,000 was not included in the $116,000, but also stated that the awards were not compounded. Finally, the court's attempts to have the parties agree to mold the verdict failed.

Pursuant to Rule 4:49-1(a), a new trial may be granted "to all or any of the parties and as to all or part of the issues" on the filing of a motion to the trial court. Moreover, the trial judge "shall grant the motion if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice on the law." R. 4:49-1(a). If an error is confined to certain issues, then a court should grant a partial new trial; if the error tainted the entire verdict, then a court should order a new trial on all the issues. See Negron v. Melchiorre, Inc., 389 N.J. Super. 70, 84-85 (App. Div. 2006); see also Bell Atl. Network Servs., Inc. v. P.M. Video Corp., 322 N.J. Super. 74, 111 (App. Div. 1999) (stating that a new trial on damages can be ordered if the issue is "distinct and separable from the issue of liability") (quoting Juliano v. Abeles, 114 N.J.L. 510, 512 (1935)).

A-1377-18

The standard governing our review of a trial court's decision on a motion for a new trial is "essentially" the same as that of the trial judge. Dolson v. Anastasia, 55 N.J. 2, 7 (1969). The standard of review for a motion for a new trial is whether there was a miscarriage of justice under the law. Id. at 6-8.

We agree with the trial court that the verdict was inconsistent. Furthermore, pursuant to Rule 4:39-2, when the answers to the jury's interrogatories are "inconsistent with each other and one or more is inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers and verdict or may order a new trial." Thus, when the jury's answers to the jury interrogatories are inconsistent, the trial court has two options. Neither the trial court nor reviewing court can mold the verdict to the court's perception of what the jury intended, so the court is generally bound to the decision in determining a need for a new trial, especially once the jury is discharged. See Kassick v. Milwaukee Elec. Tool Corp., 120 N.J. 130, 135 (1990); see also Love v. Nat'l R.R. Passenger Corp., 366 N.J. Super. 525, 533 (App. Div. 2004).

Here, the court tried, but failed to have the parties agree to mold the verdict. The jury had been dismissed without the court reconciling the

A-1377-18

inconsistencies in the verdict.  As a result, the court's only option was to order a new trial.

VI.

The Feldman defendants assert that the court erred when it determined the quantum of attorneys' fees awarded to PACA after the second trial. Specifically, they contend that PACA only had limited success throughout the litigation, which should have resulted in a lower award of attorneys' fees.  We reject their argument.

After the second trial, the jury determined that Felbee Realty, LP, was liable for violations of the CFA and PREDFDA; awarded $56,000 in damages for the roof, $425,000 for the exterior (repointing), and $45,000 for the lintels for the CFA claim; and awarded the same amounts for the PREDFDA claim. Felice and Robert were found personally liable for CFA violations as to the roof in the amount of $56,000 and lintels in the amount of $45,000 and for PREDFDA violations as to the roof and lintels, with the same damages.

As to the common law fraud claims, the jury determined that Felbee Realty, LP, and Felice were liable only with respect to the lintels, each causing $45,000 of damages.  The jury concluded that Felice and Robert were liable for $100,000 in damages for their breaches of fiduciary duties by willfully

33

using reserve funds for maintenance in violation of the by-laws; the jury found, however, that they did not willfully recommend and implement historically inadequate repairs. In a separate punitive damages trial, the jury would not award punitive damages for common law fraud and breach of fiduciary duty because the jury found no actual malice or willful and wanton disregard for PACA's rights.

Thus, the total damage award from the second trial against Felbee Realty, LP was $526,000, which was trebled to $1,578,000. The total damage award against Felice and Robert was $101,000, which was trebled to $303,000, plus the $100,000 for the breach of fiduciary duty claim, for a total of $403,000. On October 23, 2018, the court issued a written opinion regarding PACA's fee application and identifying these amounts. The court noted that PREDFDA and CFA violations both provide for the award of attorneys' fees, so the court considered the application.

When evaluating the fee application, the court considered the qualifications of PACA's attorneys and their billing rates, along with the qualifications and rates of one paralegal and concluded that the rates charged were reasonable hourly rates. As to the reasonableness of the hours expended, the court reduced the hourly rate of Richard Hertzberg from $415 an hour to

34

$300 an hour because he was one of two experienced trial attorneys that served as co-counsel for PACA. As a result, the court reduced the requested fees by $46,839.50 and it reduced the attorneys' fees sum by $45,000 because it determined that the trial preparation by PACA's attorneys was excessive.

The court also determined that PACA was entitled to legal fees in connection with the first trial because the problems caused at the conclusion of the first trial were due to an irreconcilably inconsistent jury verdict.

As to the second trial, the court explained that it could not conclude if PACA's success was limited or partial because there need not be proportionality between the damages recovered and the attorney fee award. The verdict against Felbee Realty, LP exceeded $1.5 million and the verdict against Felice and Robert totaled $403,000. The court further held that the apportionment of attorneys' fees under the CFA was not permissible and that the provision of fees was mandatory.

Next, the court considered whether fees should be apportioned between claims where fee shifting was permitted, such as the CFA violation, versus claims where fee shifting was not permitted, such as fraud and breach of fiduciary duties. It explained that when claims involve common core facts and are based on related legal theories, the claims cannot be viewed as discrete

35

claims. The court noted, however, that the breach of fiduciary duty claims were entirely different and distinct from the CFA and PREDFDA claims, so there were no common core facts. Thus, the court could not shift fees.

As a result, the court concluded that there would be an equitable allocation of the legal fees: 80% to the CFA and PREDFDA claims; and 20% to the non-fee shifting claims for fraud and breach of fiduciary duties. The court further determined that a contingent fee enhancement limited to 5% was appropriate, rejecting PACA's request of 20%. The court also reduced the fees sought by PACA with respect to preparing the fee application from $55,637 to $35,000 but awarded the full amount of costs. Thus, the total amount of fees awarded was $998,864.72 plus costs of $35,727.31, which totaled $1,034,592.[5]

The court may exercise its discretion to award attorneys' fees when such fees are authorized by statute. Rendine v. Pantzer, 141 N.J. 292, 322 (1995). A reviewing court applies an abuse of discretion standard to a trial court's decision to award attorneys' fees. Diamond Beach, LLC v. March Assocs.,

---

[5] The total fee award was $1,239,297.50 less $46,839.50 (reduction in Hertzberg's time) less $45,000 (excessive trial preparation), for a total of $1,147,458. $1,147,458 was then multiplied by 80%, the amount allocated for the fee shifting claims, to reach $917,966.40. $917,966.40 was then multiplied by 1.05% for the fee enhancement for a total of $963,864.72. Next, the court added $35,000 for the allowed fees for the preparation of the fee application and added $35,727.31 for allowed costs. The resulting total was $1,034,592.

Inc., 457 N.J. Super. 265, 285 (App. Div. 2018); Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005) (explaining that abuse of discretion occurs when a decision "based upon consideration of irrelevant or inappropriate factors or amounts to a clear error of judgment").

While the amount of damages that a plaintiff recovers is relevant to the amount of attorneys' fees to be awarded, there is no requirement that these amounts be equal or that the award of attorneys' fees be less than the damage award. Chattin v. Cape May Greene, Inc., 243 N.J. Super. 590, 616 (App. Div. 1990). Here, the court carefully distinguished between the successful claims and whether they were fee shifting or non-fee shifting. The court correctly recognized that there was no requirement that the amount that PACA recovered needed to be equal or that the attorneys' fees needed to be less than the damage award.

Next, the court must determine whether the "lodestar amount" of attorneys' fees awarded were reasonable under R.P.C. 1.5(a), which states that the court may consider:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; [and]

(8) whether the fee is fixed or contingent.

[Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 22 (2004).]

Here, the lodestar amount was reasonable because an application of R.P.C. 1.5(a) does not suggest any further reductions. Further, the matter was complex in terms of the engineering elements, the need for discovery, the extensive motion practice, the Lopez hearing, and two trials with multiple witnesses. Additionally, post-verdict motions followed both trials.

In sum, the court did not abuse its discretion when it awarded attorneys' fees to PACA. Rather, the court grounded its conclusions in a proper analysis of the facts as applied to the relevant case law.

38

## VII.

In its cross-appeal, PACA contends that the court erred in denying PACA's motion for a judgment notwithstanding the verdict pursuant to <u>Rule</u> 4:40-2. Specifically, PACA alleges that the jury's conclusion that the individual defendants were not liable for the exterior misrepresentation was against the weight of the evidence. PACA argues that the motion should be granted and the verdict molded to impose personal liability against Felice and Robert for the CFA and PREDFDA violations concerning the repointing. Finally, PACA complains that the trial court did not identify how the record supported the exoneration of Felice and Robert as to repointing. On appeal, PACA does not seek a new trial, but rather asks that we impose joint and several liability against Felice and Robert's estate in the amount of $425,000, which represents the damages imposed upon Felbee Realty, LP, for the repointing of the exterior.

We reject PACA's arguments. A reasonable jury could have concluded that neither Felice nor Robert was personally liable for the CFA and PREDFDA claims related to the exterior.

The purpose of <u>Rule</u> 4:40-2 is to allow the court to correct "clear error or mistake" by the jury. <u>Dolson</u>, 55 N.J. at 6. The court should not substitute its

A-1377-18

own judgment for that of the jury just because it would have reached a different conclusion. Ibid. Importantly, the jury's verdict is entitled to great deference. Est. of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000). The jury's verdict will only be disturbed when the court concludes that a reasonable jury could not have reached such a verdict. Ibid.

As a threshold matter, PACA's argument fails that the court did not identify how the record supported the exoneration of the individual defendants as to exterior. The record reflects that the court considered PACA's arguments as to both the CFA and the PREDFDA. It analyzed the evidence and examined the jury sheet in each instance as it related to both Felice and Robert. It discussed how the evidence presented could have reasonably led to the jury's ultimate conclusions. We discern no error in the court's conclusions.

In sum, the court did not err when it denied PACA's motion for judgment notwithstanding the verdict. The record reflects that reasonable minds could differ as to the inferences and deductions based on the evidence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION